**WORTHEN BANK & TRUST CO.,**
Plaintiff,

v.

**FRANKLIN LIFE INSURANCE CO.,**
Defendant.

**No. LR–65–C–111.**

United States District Court
E. D. Arkansas, W. D.

Jan. 5, 1966.

1

Edward L. Wright, of Wright, Lindsey & Jennings, Little Rock, Ark., for plaintiff.

Austin McCaskill, of Barber, Henry, Thurman, McCaskill & Amsler, Little Rock, Ark., for defendant.

## MEMORANDUM OPINION

HENLEY, Chief Judge.

■ This is a suit brought by plaintiff, Worthen Bank & Trust Co., a national banking institution domiciled in Little Rock, Arkansas, against the Franklin Life Insurance Co., an Illinois corporation, authorized to do business in Arkansas, but having its principal place of business in Springfield, Illinois, to recover $11,842.44, plus interest and costs. Thus, federal diversity jurisdiction is established.

The basis of the suit is an assignment to plaintiff from one Rea Coulter, a former general agent of the defendant, of renewal commissions to become due from defendant, to secure a bank loan of $15,000. The assignment was executed and the loan made in February 1964. Defendant consented in writing to the assignment and paid over to the bank Coulter's renewal commissions which accrued from March 1964 through July of that year. In the early days of August 1964 defendant discovered that Coulter had embezzled more than $30,000 in funds belonging to the defendant or to defendant's policy holders; defendant thereupon summarily discharged Coulter and refused to make further payments to the bank, contending that under the terms of the agency contract between Coulter and the insurance company Coulter had forfeited all right to receive commissions on renewals. When the insurance company suspended payments to the bank, the unpaid balance of the loan to Coulter was $11,842.44, the principal sum in suit.

There is no dispute about the controlling facts, and both sides have moved for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure, 28 U.S.C.A. The case has been submitted upon the record and thorough memorandum briefs.

Coulter was employed originally by defendant in 1948, and the terms and conditions of his employment were set forth in a written contract, a copy of which is before the Court. The contract provided that he was to receive commissions

on the premiums paid on insurance written by him, including commissions on renewal premiums paid by policy holders. Section 22 of the contract provided that if Coulter should misappropriate funds, he would be subject to immediate discharge and would forfeit all benefits under the contract, but that such discharge and forfeiture would not affect adversely any claims of the company against him. Section 26 of the contract authorized the company to offset against earned commissions of Coulter any indebtedness owed or becoming owed by Coulter to the company, regardless of whether due or not.

Apparently, Coulter was an excellent insurance salesman, and by February 1964 his renewal commissions were amounting to several thousand dollars a year and were increasing steadily as the years went by. His expectancy of receiving future commissions on renewals on policies written or to be written by him had a present value in February 1964 of approximately $28,000. That expectancy may be referred to, somewhat inexactly, as Coulter's "vested renewals."

In the month just mentioned Coulter appeared at the banking establishment of plaintiff and expressed a desire to borrow $15,000. When Coulter presented himself at the bank, he had in his possession a letter to him from Jack Watson, a superior employee of defendant with offices at Springfield, Illinois, to the effect that Coulter's vested renewals had the present value which has been mentioned.

In the dealings between Coulter and the bank, the latter was represented by Richard F. Gates, an experienced banker, who was one of plaintiff's vice presidents, and a loan officer of the bank. The two men had not met previously and Gates knew nothing about Coulter.

The only security which Coulter proposed to give for the loan which he desired to obtain was an assignment of his renewal commissions, and he was able to induce Gates to make the loan on that security, assuming that the insurance company would consent to an assignment of the commissions for security purposes.

On February 19, 1964, Gates wrote a letter to Watson which letter read, in part, as follows:

"Mr. Coulter desires to assign his renewal commissions to us in connection with the negotiation of a loan. It will be appreciated if you will confirm your letter addressed to Mr. Coulter and inform me the correct terminology to use in making an assignment of renewal commissions exclusive of the first years premium. If you have an assignment form satisfactory for this purpose, I would appreciate having a copy, in addition to an expression from you that you will accept the assignment and make payments direct to us of the said renewal commissions."

Watson evidently received the Gates letter on February 20 because on that day he wrote Gates thanking him for the "fine help" he was proposing to give to Coulter. The letter stated that the writer was pleased to "recommend" Coulter; that Coulter was a "super star" salesman; that in 1963 Coulter had ranked 16th among more than 3,000 Franklin "field associates;" and that Coulter was a member of the "Million Dollar Round Table."

With his letter to Gates, Watson enclosed three copies of a form of assignment of renewal commissions and Franklin's consent thereto. Watson gave instructions about the execution of the forms, and stated that when the transaction was completed, the insurance company would forward Coulter's renewal commissions to the bank every two weeks until the loan should be discharged or the assignment released.

At that time Coulter was indebted to his company on a note to the extent of $1,847, and Mr. Watson requested that his loan be repaid out of the proceeds of the bank loan to Coulter, a course to which both Coulter and the bank were agreeable.

Everything being at length in order, Coulter on February 24, 1964, executed his note in favor of the bank in the principal sum of $15,000 bearing interest at the rate of 6 per cent per annum from

date, with the interest being payable semi-annually.[1]

The proceeds of the loan were disbursed to the insurance company to the extent of $1,847 with the balance going to Coulter.

On August 5, 1964, an assistant vice president of the insurance company advised the bank that Coulter had been discharged for fraud on August 3, had forfeited all rights to renewal commissions, and that no further payments to the bank would be made.

At the time of his defalcation Coulter was covered by a fidelity bond issued by the National Surety Corporation in favor of the insurance company. The record here reflects that the bonding company eventually paid the insurance company in full the loss occasioned by Coulter's misconduct and became subrogated to the rights of the insurance company against Coulter. Whether the bonding company, as subrogee, has any claim against the insurance company with respect to moneys which normally would have been paid to Coulter as renewal commissions is a debated question, which the Court finds it unnecessary to decide. The Court has been advised by counsel for the insurance company that, whether obligated to do so or not, his client is in fact paying over to the bonding company Coulter renewal commissions as they accrue and is not retaining such commissions for its own use.

■ As things were in February 1964 the right of Coulter to receive commissions on renewal premiums paid by Franklin policy holders who had bought their insurance from Coulter was a property right, subject to assignment. However, ordinarily the bank as assignee of Coulter would stand in his shoes, and any defense which the insurance company might have against Coulter if sued by him for renewal commissions would be available in a suit by the bank as assignee of the commissions. See in this connection Ark. Stats., §§ 68–801 and 68–803.

In bringing this action plaintiff apparently recognizes that from a legal standpoint its position is no better than that of Coulter, and that if this suit were brought by Coulter, he could not prevail. Plaintiff bottoms its case upon the proposition that by representations and conduct both before and after the making of the loan defendant is estopped from invoking the pertinent provisions of the agency contract as against the bank, and is estopped from tendering the obvious defenses which it would have had if sued by Coulter.

More specifically, plaintiff alleges that defendant by representations and conduct "induced" plaintiff to make the loan to Coulter in the first instance; that defendant has benefited directly from the loan to the extent of $1,847; and that defendant has received and is receiving substantial money benefits from Coulter's alleged shortage on account of the bond executed by National Surety Corporation in favor of the defendant. It is said further that plaintiff relied on the representations and conduct of defendant when plaintiff made the loan.

Defendant denies that the equitable contentions advanced by plaintiff have any merit and insists that it has simply done what it had a right to do under the contract documents and has no obligation to continue to pay to the bank commissions which it would not have been required to pay to Coulter.

■■ From what has been said it is clear that plaintiff relies in the last analysis on the doctrine of equitable estoppel. There is no question that a party to a transaction may be equitably estopped to assert a claim or defense ordinarily available to him or to it if such party makes a representation or engages in conduct which he knows or should know will probably mislead the other party, and where

---

1. It may have been contemplated that the note would be renewed at least once because the renewal commissions which Coulter had been earning in years past were not sufficient to indicate that a $15,000 note could be retired in one year by the application of such commissions.

the other party, acting reasonably and in good faith, does in fact rely to his detriment upon such representation or conduct. It must always be remembered, however, that the concept of equitable estoppel involves some element of fault or blame on the part of the party against whom the estoppel is to be asserted. See in this connection 19 Am.Jur., Estoppel, § 42; American Casualty Co. of Reading, Pennsylvania v. Hambleton, 233 Ark. 942, 349 S.W.2d 664; Moorehead v. Universal C.I.T. Credit Corp., 230 Ark. 896, 327 S.W.2d 385.

■ When the record in this case is considered in the light of what has just been said, the Court simply cannot find here facts which would justify a holding that defendant is estopped from asserting against the bank defenses which could have been asserted successfully against Coulter. It follows that the equitable theory of plaintiff cannot be sustained, and the complaint must be dismissed.

The argument that the insurance company "induced" the bank to make the loan to Coulter is clearly fallacious, although it is quite possible that the loan would not have been made in the absence of defendant's statements to the effect that Coulter's vested renewals had a present value of approximately $28,000 and to the effect that the insurance company would consent to the transfer and would pay the renewal commissions to the bank. Absent those statements it is inferable that the bank would either have refused to make the loan to Coulter or would have required him to put up other collateral.[2]

But, those representations were not made by the defendant until after Coulter had applied to the bank for the loan and until after the bank had made inquiry of the defendant as to the present value of Coulter's vested renewals and about the assignment of them to the bank. There is nothing to suggest that the representations were false. The insurance company indicated that the vested renewals had a certain present value, that the insurance company would consent to the assignment, and would pay the commissions over to the bank during the life of the assignment. The insurance company did consent to the assignment and it did pay to the bank the commissions until it discovered Coulter's frauds.

The representation about the present value of the vested renewals was not, and no banker of ordinary prudence and experience would have considered it to have been, a representation that the insurance company in February 1964 was indebted to Coulter in the sum of approximately $28,000 which was in all events payable to Coulter or his assignee. The insurance company did not guarantee the payment of the loan, nor did it warrant that Coulter would remain in its employ or continue to be entitled to receive the renewal commissions called for by the agency contract.

On the contrary the assignment and consent thereto expressly advised the bank of the insurance company's right of set-off and expressly advised the bank of the fact that the assignment and consent were subject to all of the terms and conditions of the agency contract. It is true that Mr. Gates did not know what the terms and conditions of the agency contract were, but he could have learned by demanding a copy of that document before making the loan.

■ The affidavit of Mr. Gates is to the effect that he went into the banking business in 1929; that he remained in banking until 1943 when he went into military service; that he was first employed by Worthen in 1955, and that he became a vice president and loan officer in 1959. The Court does not believe that Worthen would care to deny that it is at

---

2. The record reflects that ultimately the bank did require Coulter to pledge a life insurance policy issued to him by The Equitable Life Assurance Society; unfortunately for the bank that policy seems to have no cash surrender value. The bank may eventually receive the proceeds of that policy should Coulter die while the policy is in force and still assigned to the bank.

least one of the oldest and strongest banks in Arkansas, and the Court does not think it unreasonable to expect that one of its vice presidents and loan officers about to make a loan to a man with whom he was previously unacquainted and with whom he had had no prior dealings would take steps to find out the terms and conditions to which the assignment which he was about to accept as collateral was subject. The Court thinks that the bank is charged with knowledge of the terms of the agency contract, which knowledge it could have obtained readily had ordinary diligence been employed. Banks expect those who deal with them to know or be charged with knowledge of contract terms and conditions prescribed by the former; and when a bank deals with another company which attaches terms and conditions to its undertakings, it is only fair that the bank be charged with knowledge of the same.

The Court is not impressed by the fact that Mr. Watson "recommended" Coulter to the bank, or referred to him as an outstanding or "super star" salesman and as a member of Franklin's "Million Dollar Round Table." While such a recommendation and such flattering representations from the home office are doubtless pleasing to an insurance salesman such as Coulter, they are hardly likely to induce a banker of ordinary prudence to make a substantial loan which otherwise would not have been made.

█ The bank's argument that the insurance company is estopped because it accepted out of the proceeds of the bank loan payment of the $1,847 owed by Coulter on his note to the insurance company is sufficiently answered by saying that when the insurance company received that payment it did not know that Coulter was an embezzler, and there is nothing of record to indicate that it had any reason to know that fact if, indeed, it was a fact at the time. It cannot be argued successfully that the insurance company induced the bank to make a $15,000 loan to Coulter so that the insurance company could receive payment of a sum of less than $2,000 owed to it by Coulter.

If the renewal commissions which the bank deemed sufficient to secure a $15,000 loan were in fact sufficient for that purpose, they were certainly sufficient to afford security to the insurance company for its much smaller claim.

Plaintiff contends that since defendant has been paid by the bonding company the amount of Coulter's shortages, defendant would be enriched unjustly if permitted to retain for itself moneys which it would have paid to Coulter had he been or remained honest. If such is permitted, says the bank, the insurance company will be "making a profit" out of Coulter's fraud and consequent discharge.

█ Again the Court disagrees. When Coulter's fraud was discovered, the insurance company had a right to discharge him and to forfeit his right to commissions on renewal premiums; while the insurance company was not compelled to exercise its power to forfeit Coulter's renewal commissions, the Court does not see that the insurance company owed any duty to the bank not to do so merely because the bank would suffer if such action were taken. It is quite true that equity will not permit one to profit unjustly at the expense of another, but a party who is free from fault, as is the insurance company here, cannot be said to be "unjustly enriched" merely because it has chosen to exercise a contract right. Parties to business transactions are required to act justly and honestly, but they are not required to act unselfishly or altruistically.

Further, as has been stated, it appears that regardless of its obligation to do so the insurance company is paying the Coulter renewals over to the bonding company. While it may be that the insurance company is not required to make those payments, the Court cannot see that the bank has any right to complain because the insurance company is doing so voluntarily.

When all is said and done, the bank simply made a loan on security which turned out to be inadequate. Mr. Gates evidently did not anticipate that Coulter's

renewal commissions might be forfeited on account of misconduct on the part of Coulter, but, as stated, the Court thinks that Mr. Gates and the bank were charged with knowledge of and bound by section 22 of the agency contract.

Let the complaint be dismissed at plaintiff's cost.