DALE E. WREDE ET AL., COPERSONAL REPRESENTATIVES OF THE ESTATE OF JUNE L. WREDE, DECEASED, APPELLANTS AND CROSS–APPELLEES, V. EXCHANGE BANK OF GIBBON, NEBRASKA, APPELLEE AND CROSS–APPELLANT.

531 N.W.2d 523

Filed May 5, 1995. No. S–93–1018.

Kent A. Schroeder, of Ross, Schroeder, Brauer & Romatzke, for appellants.

David W. Jorgensen, of Nye, Hervert, Jorgensen & Watson, P.C., for appellee.

Robert J. Hallstrom, of Brandt, Horan, Hallstrom & Sedlacek, for amicus curiae Nebraska Bankers Association, Inc.

WHITE, C.J., CAPORALE, FAHRNBRUCH, LANPHIER, WRIGHT, and CONNOLLY, JJ., and BUCKLEY, D.J.

CAPORALE, J.

## I. STATEMENT OF CASE

The defendant-appellee, Exchange Bank of Gibbon, Nebraska, a banking institution organized and chartered under the laws of Nebraska, offset a claim against a certificate of deposit it had issued to June L. Wrede and others. Wrede thereupon instituted this suit to recover the amount of the setoff, asserting a number of theories of recovery as more particularly set forth in part IV hereof. Notwithstanding that the district court entered a judgment in her favor on one of her theories, Wrede undertook this appeal to the Nebraska Court of Appeals, asserting that the district court erred in ruling against her on her other theories. The Bank of Gibbon responded by cross-appealing, averring that the district court erred in ruling in favor of Wrede at all. We thereafter granted Wrede's petition to bypass the Court of Appeals. Wrede has since died, and the action has been revived in the names of her copersonal representatives, her children, Dale E. Wrede, Marilyn L. Ramsay, and Donna L. Ellis, as plaintiffs-appellants. For the reasons hereinafter set forth, we now reverse the judgment of the district court and remand the matter with the direction that it be dismissed.

## II. FACTS

Wrede initially purchased from the Bank of Gibbon certificates of deposit numbered 7463, 11604, and 11712, each having a face value of $18,725.

Later, Wrede's son and his wife bought a grocery store and borrowed $70,000 from the Bank of Gibbon, executing promissory notes totaling $70,000 in its favor. In order to secure the loans, Wrede pledged certificate 11712 as collateral, executing an "Assignment of Certificate of Deposit." The Bank

of Gibbon then took possession of the instrument.

Thereafter, Wrede asked that the names of her son and her daughter Marilyn Ramsay be added to all three of the certificates then outstanding. The bank complied by typing "or Dale Wrede and Marilyn Ramsay WROS" after Wrede's name.

During a later renewal period, Wrede decided of her own accord to cash certificate 11604 and purchase two new certificates in its place. She presented herself at the Bank of Gibbon, endorsed and surrendered certificate 11604, received $20,268.54, and with that money purchased and received a new 12–month nonrenewable certificate numbered 12024 in the amount of the original principal, $18,725, which bore a higher interest rate than the replaced certificate, and a 6–month certificate numbered 7651 with the remaining $1,543.54. At Wrede's request, each of the new certificates included the names of her son and her daughter Marilyn Ramsay in the same manner as their names had appeared on the replaced certificate.

However, the new certificates differed from the replaced certificate in that the new instruments contained a provision reading:

> RIGHT OF SET–OFF...Bank may, at any time and for any reason, charge to or set–off against any amount then on deposit in this and any other account, whether or not then due, any and all debts or liabilities then owed to bank by depositor or, in the case of a multiple–party account, by any party to such multiple–party account.

Wrede did not read the new certificates, and the employee of the Bank of Gibbon issuing them did not know of the setoff provision.

The son and his wife thereafter defaulted on their loan, and the Bank of Gibbon set off its claim against a certificate substituted for previously assigned certificate 11712. The Bank of Gibbon later satisfied the balance of $15,384.54 remaining due on the loan by setting off that sum against certificate 12024.

## III. SCOPE OF REVIEW

As the analysis which follows will demonstrate, the questions presented turn out to be questions of law, in connection with which this court has an obligation to reach an independent conclusion irrespective of the determination made by the trial

court. *Rust v. Buckler, ante* p. 852, 530 N.W.2d 630 (1995).

## IV. ANALYSIS OF WREDE APPEAL

Wrede complained that in one way or another, the district court ruled against her on three of the theories of recovery she had pled, namely, on the claimed violations of the Bank of Gibbon's alleged duty to disclose the offset provisions to her; its alleged duty to comply with the Securities Act of Nebraska, Neb. Rev. Stat. §§ 8–1101 through 8–1123 (Reissue 1991); and its alleged duty to comply with the provisions of the Consumer Protection Act, Neb. Rev. Stat. §§ 59–1601 through 59–1623 (Reissue 1993).

Wrede had also claimed she was entitled to recover on the theory of assumpsit for money had and received. In connection with that theory, the district court found that it could not "in good conscious [sic] find that the contractual provisions of 'right of set–off', should be enforceable" and entered judgment for Wrede in the sum of $15,384.54, plus interest at the certificate rate from about the date of setoff.

The first question which presents itself is whether, having obtained a judgment in her favor, Wrede had standing to appeal and, if so, what she had standing to question. Only an aggrieved party can take an appeal. *Atokad Ag. & Racing v. Governors of Knts. of Ak–Sar–Ben*, 237 Neb. 317, 466 N.W.2d 73 (1991), *overruled in part, Eccleston v. Chait*, 241 Neb. 961, 492 N.W.2d 860 (1992); *Federal Dep. Ins. Corp. v. Swanson*, 231 Neb. 148, 435 N.W.2d 659 (1989), *overruled in part, Eccleston, supra*. However, a nonaggrieved party against whom an appeal is taken may cross–appeal. *Eccleston, supra*; Neb. Ct. R. of Prac. 1E (rev. 1992). One who has been granted that which she or he sought has not been aggrieved. *Federal Dep. Ins. Corp., supra*; *Saum v. L. R. Foy Constr. Co., Inc.*, 190 Neb. 783, 212 N.W.2d 648 (1973). However, an appeal lies if the judgment possesses qualities and legal consequences different from those sought on alternative grounds. See, *Galvan v. Miller*, 79 N.M. 540, 445 P.2d 961 (1968); *Aetna Casualty and Surety Company v. Cunningham*, 224 F.2d 478 (5th Cir. 1955).

Wrede sought and was entitled only to money damages under

either of the assumpsit and nondisclosure theories. Thus, the judgment she obtained under the assumpsit theory embodies the same qualities and legal consequences as would a judgment entered under the nondisclosure theory. As a result, as of the time of her appeal, Wrede had not been aggrieved by the adverse ruling on the nondisclosure theory; as a consequence, she may not question the district court's adverse ruling in that connection.

However, had Wrede been successful under either the securities or consumer protection theory, she would have been entitled to an attorney fee in addition to the money damages she recovered under the assumpsit theory. §§ 8–1118 and 59–1609. Thus, any erroneous adverse ruling with respect to either of those theories would have aggrieved Wrede. We therefore turn our attention to those theories.

### 1. SECURITIES ACT OF NEBRASKA

Without detailing what specific provision was involved, Wrede urged that the Bank of Gibbon's failure to call her attention to the differences between replaced certificate 11604 and new certificate 12024 somehow violated the Securities Act of Nebraska. The act defined "security" as meaning

> any note, stock, treasury stock, bond, debenture, units of beneficial interest in a real estate trust, evidence of indebtedness, certificate of interest or participation in any profit–sharing agreement, collateral–trust certificate, preorganization certificate or subscription, transferable share, investment contract, voting–trust certificate, certificate of deposit for a security, certificate of interest or participation in an oil, gas, or mining title or lease or in payments out of production under such a title or lease, in general any interest or instrument commonly known as a security, or any certificate of interest or participation in, temporary or interim certificate for, guarantee of, or warrant or right to subscribe to or purchase any of the foregoing. Security shall not include any insurance or endowment policy or annuity contract issued by an insurance company.

§ 8–1101(12).

The parties note that this part of the Securities Act of Nebraska is patterned after the Uniform Securities Act, which, for the purposes of the definition of security in this context, is essentially the same as the federal Securities Act of 1933, 15 U.S.C. § 77b(1) (1988), and the Securities Exchange Act of 1934, 15 U.S.C. § 78c(a)(10) (1988). See *Marine Bank v. Weaver*, 455 U.S. 551, 102 S. Ct. 1220, 71 L. Ed. 2d 409 (1982). Therefore, federal court decisions interpreting the meaning of security are helpful.

In *Marine Bank*, the U.S. Supreme Court analyzed the issue of whether a conventional certificate of deposit is a security. Therein, the respondents had purchased a $50,000 certificate of deposit from the petitioner bank. The respondents then pledged it to guarantee a loan made by the bank to a company which was indebted to it. In exchange, the respondents were to share in the company's profits. The respondents claimed that the loan was to be used to provide working capital for the company, but that, instead, the bank immediately applied it to the company's overdue obligations, which resulted in the company going bankrupt and making it likely that the bank would liquidate the certificate to satisfy the company's obligations. The respondents alleged that the bank knew of the plan to apply the loan to the outstanding obligations rather than allow the company to use it for working capital and that the bank did not disclose this fact.

The *Marine Bank* Court noted that although the word "security" as defined was broad and intended to include many types of instruments including uncommon or irregular ones, the language reading unless " 'the context otherwise requires' " revealed that Congress did not intend to provide a broad federal remedy for all fraud. 455 U.S. at 556.

In distinguishing the certificate of deposit from capital shares in a savings and loan association, which had been held to be securities in *Tcherepnin v. Knight*, 389 U.S. 332, 88 S. Ct. 548, 19 L. Ed. 2d 564 (1967), the *Marine Bank* Court noted that the savings and loan association shares came with voting rights and did not pay a fixed rate of interest, but dividends based on profits, making them more like shares of stock.

In contrasting an ordinary certificate of deposit from other long–term–debt obligations often found to be securities, the

*Marine Bank* Court emphasized that the certificate had been issued by a heavily regulated bank which was federally insured, meaning that there was really no risk involved, as the purchaser was virtually guaranteed full payment rather than assuming the risk of the borrower's insolvency. The Court then concluded that in the context presented, there had not been a purchase or sale of a security.

In *Reves v. Ernst & Young*, 494 U.S. 56, 110 S. Ct. 945, 108 L. Ed. 2d 47 (1990), an agricultural cooperative had advertised and sold uninsured and uncollateralized demand promissory notes paying an adjustable interest rate, advertising them to be safe and secure investments. The cooperative then went bankrupt. The plaintiffs alleged that the defendant auditors for the cooperative had failed to follow generally accepted accounting principles, thereby inflating the value of the property and violating securities laws.

The *Reves* plurality indicated that in determining whether the transactions involved securities, it would take into account economic realities, considering substance over form to effectuate the Congressional purpose of regulating investments. Concluding that the term *"any* note" as used in the definition should not be read literally, as many notes are not securities, the *Reves* plurality nonetheless held the notes in question to be securities. In doing so, it noted that the purpose of the seller was to raise money for its general business operations; that the notes were bought to earn profits in the form of interest; that there was "common trading" of the notes, which were offered and sold to a broad segment of the public; that the public reasonably perceived from the advertisements that the notes were investments; that there was no risk–reducing factor; and that in the absence of applying the securities laws, the notes would escape federal regulation.

In short, the notes in *Reves* did not bear a " 'family resemblance' " to the list of items judicially determined not to be securities and thus did not overcome the presumption that any note payable after a sufficient length of time is a security. 494 U.S. at 67.

The situation here is more like that presented in *Marine Bank* than that presented in *Reves*. Deposits in Nebraska banks are

protected by reserve, reporting, and inspection requirements. See Neb. Rev. Stat. §§ 8-108, 8-110, 8-112, and 8-131 (Reissue 1991). Also, Nebraska banks must be federally insured or give notice that the fact is otherwise. Neb. Rev. Stat. §§ 8-103.01 and 8-702 (Reissue 1991). An insolvent Nebraska bank may not accept any deposits. Neb. Rev. Stat. § 8-138 (Reissue 1991). Thus, Wrede loaned money to a heavily regulated banking institution at a fixed rate of interest with virtually no risk of loss.

Under the circumstances, certificate of deposit 12024 was not a security as contemplated by the Securities Act of Nebraska; thus, if for no other reason, the district court correctly determined that there had been no violation of that act.

## 2. CONSUMER PROTECTION ACT

Wrede also asserted that the Bank of Gibbon's failure to call her attention to the differences between the replaced and new certificates somehow violated the Consumer Protection Act, although she did not explain in what particular. At the time of the transaction in question, the act exempted from its ambit "actions or transactions otherwise permitted, prohibited, or regulated under laws administered by the Director of Insurance, the Public Service Commission, the Federal Energy Regulatory Commission, or any other regulatory body or officer acting under statutory authority of this state or the United States." § 59-1617(1).

In *Kuntzelman v. Avco Financial Services of Nebraska, Inc.*, 206 Neb. 130, 291 N.W.2d 705 (1980), we concluded that the foregoing exemption excluded from the purview of the Consumer Protection Act a loan made pursuant to the installment loan act by one licensed thereunder to make such a loan. We found it significant that not only was the licensee regulated by the state under statutory authority, but the very act of making a loan was regulated. The teaching of *Kuntzelman* is that while particular conduct is not immunized from the operation of the Consumer Protection Act merely because the actor comes within the jurisdiction of some regulatory body, immunity does arise if the conduct itself is also regulated.

This teaching was applied in *McCaul v. American Savings*

*Co.*, 213 Neb. 841, 331 N.W.2d 795 (1983), wherein we concluded that because the lender was state regulated and the loans in question had been reported to and at least indirectly approved by the regulator, the Consumer Protection Act did not apply. We next held, in *Hydroflo Corp. v. First Nat. Bank*, 217 Neb. 20, 349 N.W.2d 615 (1984), that the Consumer Protection Act did not cover the bank's failure to require, contrary to its standard practice, a corporate resolution in opening a corporate account because not only did the Department of Banking and Finance have general supervision and control over the bank, it had a duty to " '*constructively aid banks in maintaining proper banking standards and efficiency.*' " (Emphasis in original.) *Id.* at 33, 349 N.W.2d at 622. Relying on *Kuntzelman* and *McCaul*, we then ruled in *Little v. Gillette*, 218 Neb. 271, 354 N.W.2d 147 (1984), without detailing our rationale other than to note that both a bank and realty company were state regulated, that their conduct was exempt from the Consumer Protection Act.

Here, not only was the Bank of Gibbon heavily regulated by the state, but the form of certificate used was at least indirectly approved by virtue of the authority of the state, through the director of the Department of Banking and Finance, to constructively aid banks in maintaining proper banking standards and efficiency. See, *Hydroflo Corp., supra*; *McCaul, supra*.

Because issuance of the certificate was exempted from the purview of the Consumer Protection Act, the district court, if for no other reason, correctly determined that there had been no violation of the act.

### V. ANALYSIS OF CROSS–APPEAL OF BANK OF GIBBON

That brings us to the Bank of Gibbon's cross–appeal, in which it is claimed, in summary, that the district court erred in entering judgment for Wrede on her assumpsit theory.

Assumpsit for money had and received lies whenever one has received money which in equity and good conscience one should pay to another. See *Hydroflo Corp., supra*. In such a circumstance, the law implies a promise on the part of the party having the money to pay such money to the party who should

have it. See *Sesostris Temple Golden Dunes v. Schuman*, 226 Neb. 7, 409 N.W.2d 298 (1987). Although founded on equitable principles, an action in assumpsit for money had and received is one at law. See *Barker v. Wardens & Vestrymen of St. Barnabas Church*, 171 Neb. 574, 106 N.W.2d 858 (1961).

*Uttecht v. Norwest Bank of Norfolk*, 221 Neb. 222, 376 N.W.2d 11 (1985), establishes that absent proof of fraud, contractual arrangements between a bank and its depositors with respect to the bank's right of setoff may supersede statutory provisions concerning such rights. Having a contractual right to the setoff, it cannot be said that the Bank of Gibbon received money which in equity and good conscience it should have paid to Wrede. Thus, the Bank of Gibbon had every right to include a setoff provision in its certificates of deposit, and its existence provided no basis for an action in assumpsit.

Although it appears we have not expressly so written heretofore, there must be some specific legal principle or situation which equity has established or recognized to bring a case within the scope of assumpsit for money had and received. See *University v. Forbes*, 88 N.H. 17, 183 A. 860 (1936). See, also, *Beauregard v. Orleans Trust Co.*, 108 Vt. 42, 182 A. 182 (1936) (no recovery of money received can be based upon unjust enrichment when recipient can show legal or equitable ground for keeping it); *Renn v. Wendt*, 185 Minn. 461, 241 N.W. 581 (1932) (where rights of parties to money or property are governed by valid contract, action for money had and received does not lie). Stated otherwise, one who is free from fault cannot be held to be unjustly enriched merely because one has chosen to exercise a legal or contract right. Cf. *Worthen Bank & Trust Co. v. Franklin Life Insurance Co.*, 260 F. Supp. 1 (E.D. Ark. 1966), *aff'd* 370 F.2d 97 (8th Cir.); *Pelser v. Gingold*, 214 Minn. 281, 8 N.W.2d 36 (1943); *Anderson v. Anderson*, 155 Kan. 69, 123 P.2d 315 (1942).

Moreover, it is generally held that when there are contract terms controlling and there is no duress, an action for money had and received for money paid on a contract cannot be maintained without rescission of the contract. *Harriss v. Tams*, 258 N.Y. 229, 179 N.E. 476 (1932); *Newell v. Rosenberg*, 275 Mass. 455, 176 N.E. 616 (1931); *Day v. Broyles*, 222 Ala. 508,

133 So. 269 (1931); *King v. Mortimer*, 83 Cal. App. 2d 153, 188 P.2d 502 (1948); *Huth v. Picotte*, 154 S.W.2d 382 (Mo. App. 1941); *Dahler v. Meistrell*, 224 Mo. App. 815, 24 S.W.2d 238 (1929). In a different context, we have held that as there cannot be an express and an implied contract for the same thing existing at the same time, one could not at one and the same time claim there were both an express and an implied contract covering the installation of a mechanical system. *Siebler Heating & Air Conditioning v. Jenson*, 212 Neb. 830, 326 N.W.2d 182 (1982).

Wrede did not attempt to rescind the contract represented by the certificate, nor was there shown any basis for doing so. The setoff provision was there to be read, and no fraud or misrepresentation on the part of the Bank of Gibbon has been established. In the absence of fraud, one who signs an instrument without reading it, when one can read and has had the opportunity to do so, cannot avoid the effect of one's signature merely because one was not informed of the contents of the instrument. *Smith v. Ganz*, 219 Neb. 432, 363 N.W.2d 526 (1985).

Nor is the ignorance of the existence of the setoff provision on the part of the Bank of Gibbon employee who sold certificate 12024 to Wrede of any significance. Since it was the Bank of Gibbon's language, it certainly knew of it. As a consequence, it cannot be said that there occurred in any sense a mutual mistake such that no contract between Wrede and the Bank of Gibbon came into being.

Accordingly, the Bank of Gibbon's cross–appeal is meritorious.

## VI. JUDGMENT

As noted in part I, the judgment of the district court is reversed and the cause remanded with the direction that it be dismissed.

REVERSED AND REMANDED WITH
DIRECTION TO DISMISS.