ALLEN E. DAUBMAN AND RENEE A. DAUBMAN, HUSBAND AND WIFE, APPELLEES, v. CBS REAL ESTATE CO., A NEBRASKA CORPORATION, AND ARLENE ENGELBERT, APPELLANTS.

580 N.W. 2d 552

Filed July 2, 1998.    No. S-96-734.

Mark S. Dickhute for appellants.

Richard J. Rensch, of Raynor, Rensch & Pfeiffer, for appellees.

WHITE, C.J., CAPORALE, CONNOLLY, GERRARD, STEPHAN, and McCORMACK, JJ.

CAPORALE, J.

## I. STATEMENT OF CASE

Claiming that defendant-appellant CBS Real Estate Co. and its agent, defendant-appellant Arlene Engelbert, breached their fiduciary duties, plaintiffs-appellees, Allen E. Daubman and his wife, Renee A. Daubman, sought the return of the real estate sales commission they paid. Following a bench trial, the district court entered judgment in favor of the Daubmans. CBS and Engelbert appealed to the Nebraska Court of Appeals, claiming that the district court had erred in (1) finding that they breached their fiduciary duties, (2) failing to find that the Daubmans ratified and otherwise acquiesced in their actions, (3) finding that the Daubmans sustained damages, and (4) awarding prejudgment interest. Concluding that the evidence failed to support the district court's judgment, the Court of Appeals vacated the judgment and remanded the cause with directions to dismiss. See *Daubman v. CBS Real Estate Co.*, 6 Neb. App. 390, 573 N.W.2d

802 (1998). The Daubmans thereupon successfully petitioned for further review, claiming, in summary, that the Court of Appeals erroneously set aside the district court's factual findings. For the reasons hereinafter set forth, we reverse, and remand with direction.

## II. SCOPE OF REVIEW

This action is one for assumpsit for money had and received, an action which may be brought where a party has received money which in equity and good conscience should be repaid to another. *Kramer v. Kramer*, 252 Neb. 526, 567 N.W.2d 100 (1997); *Wrede v. Exchange Bank of Gibbon*, 247 Neb. 907, 531 N.W.2d 523 (1995). In such a circumstance, the law implies a promise on the part of the person who received the money to reimburse the payor in order to prevent unjust enrichment. *Kramer, supra*; *Wrede, supra*. The action, although falling under the common-law class of assumpsit, is really in the nature of a bill in equity and lies wherever the party should by equity and natural principles of justice refund the money. *Boman v. Olson*, 158 Neb. 636, 64 N.W.2d 310 (1954). Although founded on equitable principles, an action in assumpsit for money had and received is an action at law. *Kramer, supra*; *Wrede, supra*.

The judgment and factual findings of the trial court in an action at law tried to the court without a jury have the effect of a verdict and will not be set aside unless clearly wrong. *In re Estate of Wagner*, 253 Neb. 498, 571 N.W.2d 76 (1997). In reviewing an action at law, an appellate court reviews the evidence in the light most favorable to the prevailing party. *Id.* However, regarding questions of law, an appellate court is obligated to reach a conclusion independent of determinations reached by the lower courts. *State v. Hill, ante* p. 460, 577 N.W.2d 259 (1998).

## III. FACTS

As the Daubmans were considering building a new home, they wished to explore the amount for which they could sell their current home. To that end, they contacted Engelbert, a real estate salesperson working through CBS. Engelbert met with the Daubmans, and the Daubmans asked her to prepare a competitive market analysis on the property to determine its market

value. Engelbert prepared the analysis and forwarded the results to the Daubmans.

Engelbert informed the Daubmans that she was working with Thomas and Brenda Pedersen, who were looking for a residence similar in features and price to the Daubman property. According to Allen Daubman, Engelbert also stated that the Pedersens "had been pre-approved for credit in an amount more than necessary to purchase [the] home." Engelbert also stated, according to Allen Daubman, that the Pedersens had sufficient financial ability to purchase the home and that financing would not be a problem; that the Pedersens were preapproved with a particular lender for a $180,000 loan. Engelbert contradicted Allen Daubman, testifying that she did not state that the Pedersens had been preapproved for a particular amount of credit. Rather, Engelbert claims that she told the Daubmans not that the Pedersens were preapproved but that they were "qualified buyers, that [she] had been working with them, that . . . they had a savings plan, they had been paying off their debts, and they had the cash to close." Engelbert admitted telling the Daubmans that the Pedersens were capable of buying the home.

Engelbert offered to show the property to the Pedersens if the Daubmans signed a "one-party listing agreement" with CBS granting it an exclusive right to sell the property to the Pedersens only. The next day, the Daubmans signed the one-party listing agreement. Pursuant to this agreement, the Daubmans agreed to give CBS the sole and exclusive right to sell the property for $139,950 "cash or as terms agreed" to the Pedersens only, and to pay CBS a cash commission of 7 percent of the gross sales price. At the time the agreement was signed, the Daubmans notified Engelbert that they might be interested in leasing back the property or moving into an apartment, since they were contemplating building a new home, which would not be completed before the sale of their current property closed.

Engelbert showed the property to the Pedersens that same day, and later that day the Pedersens requested that Engelbert prepare an offer. Engelbert prepared an offer, which provided that the Pedersens would purchase the property for $132,000 and rent the property back to the Daubmans for a period of time. That evening, Engelbert presented the offer to the Daubmans.

Allen Daubman testified that upon receiving the offer, he told Engelbert that he was not interested, that he was very disappointed, and that he no longer wished to pursue the matter with the Pedersens. He further explained to Engelbert that he was concerned about the Pedersens' ability to obtain financing, based on the fact that their offer provided for a 95-percent loan. According to Allen Daubman, Engelbert was insistent on working something out and stated that the Pedersens' credit was "squeaky-clean." Engelbert denies using the term "squeaky-clean."

The Daubmans' plan to build a new home would require several financial obligations, including renting an apartment. Thus, if the Pedersens could not obtain a loan, the Daubmans could face the situation of not having their house sold but having to pay rent on an apartment and payments on a construction loan. To offset their risk, the Daubmans suggested to Engelbert that the Pedersens make a $5,000 nonrefundable earnest deposit. According to Allen Daubman, Engelbert recommended very strongly against such a proposal, saying that it was unnecessary, and reiterated that the Pedersens were financially strong, asserting that "they had been saving money in anticipation of buying a house; that they had cleaned up their bills; and that financing, again, should not be any problem whatsoever."

The following day, Allen Daubman prepared and faxed a counteroffer to CBS, specifying a purchase price of $139,900; an earnest deposit of $2,000; approval of financing in 30 days; closing within 30 days; and possession to be given the Pedersens at closing, all contingent upon the Pedersens being able to obtain financing of 95 percent of the purchase price at 8.5 percent for 30 years. The counteroffer would also allow the Daubmans to continue listing and showing the property for purposes of obtaining backup offers in the event the Pedersens were unable to obtain financing.

The next day, the Pedersens requested that CBS prepare another offer. The new offer provided that they would purchase the property for $139,900 with an earnest deposit of $2,000, conditional on their obtaining a conventional loan secured by a mortgage or deed of trust on the property in the sum of $132,900. The offer further provided that the Pedersens were to

apply for financing within 5 business days of its acceptance and that if financing was not approved within 30 days of acceptance of the offer, the offer would be null and void, and the earnest deposit would be returned to the Pedersens. The offer further provided that if processing of the Pedersens' loan application was not completed within 30 days, the time limit would be automatically extended until the lending agency either approved or rejected the application. The transaction was to be closed on July 29, 1992, by an escrow agent and possession given to the Pedersens on July 30. The Daubmans accepted the offer on June 12, 1992, on the condition that the possession date be subject to the availability of a mover acceptable to them. The Pedersens accepted this condition.

The Pedersens met with Residential Mortgage Services on June 15, 1992, to apply for a loan, with Engelbert in attendance. At the appointment, Engelbert did not learn of any information that would jeopardize the Pedersens' loan application, and after the appointment, she communicated the information she learned to Allen Daubman. On June 25, the Daubmans entered into an agreement for the construction of a new home. On July 9, Residential Mortgage Services notified Engelbert that it probably would not be able to make a loan to the Pedersens and recommended that the loan application be moved to another lender.

After learning of the probable denial by Residential Mortgage Services, Engelbert contacted Capital Financial Services to determine whether it could approve a loan to the Pedersens on the terms contained in their purchase agreement. On July 10, 1992, Capital Financial Services informed Engelbert that it could probably make the loan and asked her to have the loan file transferred to it. On the same day, the loan file was moved from Residential Mortgage Services to Capital Financial Services, and the Pedersens made an appointment to meet with a Capital Financial Services representative on July 13. Engelbert testified that she personally gave the loan file to the representative.

After moving the loan file, Engelbert informed the Daubmans on July 10, 1992, of the transfer, that the chances for loan approval were good, and that she would know more on July

13. According to Allen Daubman, Engelbert told him on July 10 that she assisted the Pedersens in making a separate second loan application with a different lender on July 9. The Daubmans had not authorized CBS or Engelbert to seek alternative financing on behalf of the Pedersens in the event the first financial institution turned them down. Allen Daubman asked Engelbert why she moved the Pedersens over to a second lender without first calling him, and stated that the purchase agreement was now null and void because the Pedersens had not made the second loan application within the 5-day period. Engelbert told Allen Daubman that he was wrong and that

> as long as any loan application is pending, not just the first one, but any loan application is pending, when the 30-day time period under the purchase agreement hits, that I had no choice but to wait until whatever loan application was pending is either approved or rejected by that particular lender.

Allen Daubman was concerned that if he insisted the purchase agreement was void, he could face possible legal actions by the Pedersens and CBS. Engelbert testified that she now realized that Allen Daubman's interpretation of the purchase agreement was correct and that the rejection from Residential Mortgage Services rendered the purchase agreement null and void.

The Pedersens applied for a loan to Capital Financial Services on July 13, 1992. Also on that day, Allen Daubman requested that Engelbert ask the Pedersens if they would delay the closing and possession until the end of August. The Pedersens rejected this request. Allen Daubman then asked Engelbert to contact the Pedersens and ask them if they would agree to make the $2,000 deposit nonrefundable so that the Daubmans could sign a 6-month apartment lease at the Washington Heights apartment complex. The Pedersens rejected this request as well.

Engelbert and Allen Daubman met with a representative of Capital Financial Services on July 16, 1992, to discuss the Pedersens' loan prospects. On July 17, Allen Daubman faxed a letter to Engelbert informing her that in order to perform according to the purchase agreement and vacate the property at the end of July, the Daubmans needed to sign a 6-month apart-

ment lease. However, because the Pedersens' loan had not yet been approved, the Daubmans were unwilling to sign the apartment lease. Thus, Allen Daubman suggested that the parties enter into an amendment whereby the Pedersens would make the $2,000 deposit nonrefundable and the Pedersens would be given an additional 2 weeks to obtain loan approval. According to Allen Daubman, before even discussing the proposal with the Pedersens, Engelbert told him that the proposed amendment would not be acceptable to the Pedersens. Engelbert denies that she prematurely told Allen Daubman that the Pedersens would deny the amendment. On July 18, the Pedersens rejected the amendment.

The Daubmans had located an apartment in the Washington Heights apartment complex, and the complex operator was willing to lease to them on a 6-month basis. The operator told the Daubmans that they eventually needed to sign the lease, but was not pressing them to do so. The Daubmans were trying to delay the signing as long as possible. When the Pedersens told Engelbert that they would not agree to the Daubmans' amendment, Brenda Pedersen also informed Engelbert that she had called the complex operator to check on the availability of apartments there. After speaking with the Pedersens, Engelbert called the complex operator to find out whether any apartments were available for lease, notwithstanding that the Daubmans had not authorized her to do so. According to Engelbert, "because Mrs. Pedersen had called, [the operator] was starting to put two and two together and asked me if it was about the Daubmans. And I said yes." Engelbert then called the Daubmans on July 18, 1992, and informed them of the Pedersens' rejection of the amendment. Shortly after talking to Engelbert about the proposed amendment, the complex operator called the Daubmans and insisted that they sign the lease no later than the evening of July 27.

Shortly after the "apartment incident," Allen Daubman contacted a senior vice president of CBS, indicated that he no longer wished to work with Engelbert, and requested that another salesperson handle the matter. According to Allen Daubman, he also told the vice president during this conversation that he did not think it was appropriate that CBS receive a

commission. The vice president denied that Daubman indicated at this time that he did not want to pay a commission.

Engelbert learned on July 21, 1992, from the vice president that Allen Daubman did not want her calling him. Engelbert called Capital Financial Services on July 20, 21, 22, and 23 and visited their office on July 24 to find out the status of the Pedersens' loan. She learned that Capital Financial Services had received mortgage approval that day and would be receiving formal loan approval on July 27. Engelbert prepared and faxed a letter to Allen Daubman that afternoon explaining this. On July 27, Engelbert learned that the Pedersens received formal loan approval and called Allen Daubman the same day to communicate this news to him.

On July 27, 1992, the Daubmans entered into a 6-month apartment lease. On July 30, Allen Daubman informed CBS that he did not want the escrow agent to pay CBS a commission and sent a letter to the escrow agent demanding that no moneys be withheld by it and paid to CBS for its services. The escrow agent informed Allen Daubman that it could not close the sale unless either the Daubmans agreed to allow it to deduct the commission or CBS agreed to forfeit its commission. Neither the Daubmans nor CBS would so agree. CBS' vice president told Allen Daubman that the commission had to be paid out of the closing, despite the fact that neither the listing agreement nor the purchase agreement so provided.

An employee of the escrow agent testified that in the event of a commission dispute, either the parties have to resolve the problem or the real estate agent has to give authorization to close without withholding the commission. According to this witness, "I can't go on what a seller is telling me until I get authorization from the [real estate] company to not charge a commission or whatever."

On July 31, 1992, Allen Daubman faxed an agreement to the CBS vice president informing him that the Daubmans would allow the sale to be closed and the commission to be paid out of the proceeds of the sale of the house if CBS agreed that such payment would be without prejudice to any claim the Daubmans might have over whether the commission was payable under the circumstances. The vice president agreed,

and Allen Daubman then instructed the escrow agent to close the sale.

CBS received a commission of $9,793 on August 3, 1992, and the parties stipulated that the Daubmans had suffered no damages, special or general. Finding that Engelbert and, through her, CBS had breached the fiduciary duties they owed the Daubmans, the district court awarded the Daubmans the amount of the commission, together with prejudgment interest from and after July 31, 1992, and costs.

## IV. ANALYSIS

### 1. PETITION FOR FURTHER REVIEW

We begin our analysis by focusing on the issues raised by the Daubmans' petition for further review. In considering whether the evidence supports the district court's finding that Engelbert and CBS breached their fiduciary duties to the Daubmans and whether such breach justifies a forfeiture of their commission, we recall that generally, an agent is required to act solely for the benefit of the principal in all matters connected with the agency and adhere faithfully to the instructions of the principal. *Fletcher v. Mathew*, 233 Neb. 853, 448 N.W.2d 576 (1989); *Walker Land & Cattle Co. v. Daub*, 223 Neb. 343, 389 N.W.2d 560 (1986); *Allied Securities, Inc. v. Clocker*, 185 Neb. 524, 176 N.W.2d 914 (1970). An agent and principal are in a fiduciary relationship such that the agent has an obligation to refrain from doing any harmful act to the principal. *Fletcher, supra*; *Grone v. Lincoln Mut. Life Ins. Co.*, 230 Neb. 144, 430 N.W.2d 507 (1988).

More specifically, a real estate agent owes the principal a fiduciary duty to use reasonable care, skill, and diligence in performing her or his obligations and to act honestly and in good faith. *Barta v. Kindschuh*, 246 Neb. 208, 518 N.W.2d 98 (1994). The rule requiring an agent to act with utmost good faith toward the principal places the agent under a legal obligation to make a full, fair, and prompt disclosure to the principal of all facts within the agent's knowledge which are or may be material to the matter in connection with which the agent is employed, which might affect the principal's rights and interests or influence the principal's action in relation to the subject matter of the

employment, or which in any way pertain to the discharge of the agency which the agent has undertaken. *Brezina v. Hill*, 202 Neb. 773, 277 N.W.2d 224 (1979). In a number of instances, we have held that a real estate agent's breach of duty prevented the collection of a commission. E.g., *Elson v. Pool*, 235 Neb. 469, 455 N.W.2d 783 (1990) (agent forged principal's signature); *Firmature v. Brannon*, 223 Neb. 123, 388 N.W.2d 119 (1986) (agent denigrated property); *Brezina, supra* (to protect buyer, agent signed and filed purchase agreement in violation of selling principal's wishes); *Vogt v. Town & Country Realty of Lincoln, Inc.*, 194 Neb. 308, 231 N.W.2d 496 (1975) (agent had undisclosed interest in purchase); *Allied Securities, Inc., supra* (agent had undisclosed interest in purchase); *Schepers v. Lautenschlager*, 173 Neb. 107, 112 N.W.2d 767 (1962) (agent had undisclosed interest in purchase and failed to inform principal of prospective purchaser willing to pay more than sale price); *Pearlman v. Snitzer*, 112 Neb. 135, 198 N.W. 879 (1924) (agent failed to declare he already had buyer at price above which agent was to recover commission); *Campbell v. Baxter*, 41 Neb. 729, 60 N.W. 90 (1894) (agent received commission from both buyer and seller); *Jansen v. Williams*, 36 Neb. 869, 55 N.W. 279 (1893) (agent interfered with principal's right of direct sale).

The district court based its legal conclusion that Engelbert placed her interests and those of the Pedersens above those of the Daubmans upon the following specific findings of fact:

> [E]very effort was made by . . . Engelbert to consummate sale of the premises with the Pedersens only. When the Pedersens' financial condition was shown to be precarious . . . Engelbert took several steps to keep the transaction alive for the Pedersens, and, more to the point, even when events became detrimental to the [Daubmans]. As the series of events became more convoluted and the [Daubmans] made arrangements to enter into a six-month lease of an apartment during construction of their new home . . . Engelbert on her own initiative contacted their lessor to ascertain for herself whether the Daubmans could continue to lease the property if there was a delay in the closing of the sale of [the] Daubmans' home. This "end run" is the

most glaring example of the extent to which . . . Engelbert put her own interests and the interests of the Pedersens ahead of the [Daubmans']. More damaging was the fact that closing of the sale of the Daubman home was contingent upon payment of Engelbert's and CBS' commission.

Since the listing agreement restricted Engelbert to selling only to the Pedersens, the fact that that was her sole effort could not have constituted a breach of her duty to the Daubmans. Moreover, while Engelbert and CBS refused to voluntarily forfeit their commission, it was the escrow agent that refused to close the transaction unless either the commission was voluntarily forfeited by Engelbert and CBS or the Daubmans allowed it to be paid. Thus, neither does this occurrence support the district court's legal conclusion.

However, Engelbert's effort with regard to the Pedersens' loan applications is another matter. Because it was not until July 13, 1992, that the Pedersens met with Capital Financial Services and because Engelbert took the position that the Daubmans had no choice but to wait and see whether Capital Financial Services approved or rejected the Pedersens' loan application, the Daubmans faced a considerable time problem. The purchase agreement provided that the Pedersens would take possession on July 30. Thus, the Daubmans would need to rent an apartment in order to vacate by that date. Residential Mortgage Services took 24 days on the Pedersens' loan application, and there was no way of telling exactly how long Capital Financial Services would take to either approve or reject the Pedersens' application. Moreover, as part of her effort to complete the sale no matter what the effect on the Daubmans, Engelbert, without the Daubmans' knowledge, contacted the operator of the apartment complex to check on the availability of apartments and confirmed to the operator that her inquiry concerned the Daubmans, with the result that the Daubmans were pressured into executing a lease by July 27. Although Engelbert was authorized to sell only to the Pedersens, she should not have continued to push the sale when the situation began to look detrimental to the interests of the Daubmans.

In addition, it must be remembered that although Engelbert claimed she stated only that the Pedersens were prequalified,

Allen Daubman testified that Engelbert erroneously told them that the Pedersens had been preapproved with a particular lender for a $180,000 loan, enough to buy their home. While the district court made no specific finding with regard to this issue, the rule that in a bench trial, the trial court's entry of judgment in favor of a party warrants the conclusion that the trial court found in that party's favor on all issuable facts requires that we conclude the district court resolved this issue in favor of the Daubmans. See, *Peterson v. Kellner*, 245 Neb. 515, 513 N.W.2d 517 (1994); *Burgess v. Curly Olney's, Inc.*, 198 Neb. 153, 251 N.W.2d 888 (1977). (This rule is not made inapplicable merely because in addition to a general finding, the trial court also mentioned certain matters specifically. *Burgess, supra.*)

The district court's factual findings with regard to Engelbert's treatment of the Pedersens' loan applications, her contact with the apartment complex operator, and her representation as to the preapproval of the Pedersens for a loan support the district court's legal conclusion that Engelbert and, through her, CBS put their interests in completing the sale, and thereby collecting the commission, and the interests of the Pedersens in acquiring the property ahead of the Daubmans' interests in selling the property in a manner and under a time schedule which least inconvenienced them. All of Engelbert's actions taken together support the district court's legal conclusion that she and, through her, CBS materially breached the duties they, as agents, owed their principals, the Daubmans.

## 2. CLAIMS ON APPEAL

Having so determined, we turn our attention to the errors on appeal claimed by CBS and Engelbert.

### (a) Breach of Duties

The claim that the district court erred in concluding that CBS and Engelbert breached their fiduciary duties has been resolved in considering the Daubmans' petition for further review and requires no further analysis.

### (b) Acceptance of Actions

Next, CBS and Engelbert argue that the Daubmans ratified or otherwise acquiesced in their actions. On the other hand, the

Daubmans contend that they timely disavowed CBS' and Engelbert's actions. However, ratification and acquiescence are concepts involved in determining whether an agent's actions may bind the principal or whether the agent is liable to the principal for damages resulting from an alleged breach of duty. CBS and Engelbert point out that "[t]he effect of acquiescence or ratification by the principal is that the agent is released from liability to the principal for its losses." Brief for appellants at 32. See *Barta v. Kindschuh*, 246 Neb. 208, 518 N.W.2d 98 (1994). However, this theory has no application in the instant case, and the district court did not err in failing to find that the Daubmans ratified or acquiesced in the actions of CBS and Engelbert.

### (c) Damages

Next, CBS and Engelbert allege that the district court erred in finding that the Daubmans sustained damages, as the parties stipulated otherwise. However, the issue of damages is not relevant when determining whether an agent's breach of duty results in a loss of commission.

A commission for services cannot be collected by the agent if the agent has willfully disregarded, in a material respect, an obligation which the law devolves upon the agent by reason of the agency. *Elson v. Pool*, 235 Neb. 469, 455 N.W.2d 783 (1990); *Walker Land & Cattle Co. v. Daub*, 223 Neb. 343, 389 N.W.2d 560 (1986); *Vogt v. Town & Country Realty of Lincoln, Inc.*, 194 Neb. 308, 231 N.W.2d 496 (1975). A principal whose agent has violated her or his duties may properly refuse to pay compensation. *Walker Land & Cattle Co., supra; Allied Securities, Inc. v. Clocker*, 185 Neb. 524, 176 N.W.2d 914 (1970); Restatement (Second) of Agency § 399 (1958).

### (d) Prejudgment Interest

Finally, CBS and Engelbert assert that the district court erred in awarding prejudgment interest. Neb. Rev. Stat. § 45-104 (Reissue 1993) provides that "interest shall be allowed . . . on money received to the use of another and retained without the owner's consent . . . and on money . . . due and withheld by unreasonable delay of payment." However, absent compliance with the provisions of Neb. Rev. Stat. § 45-103.02(1) (Cum. Supp. 1996), prejudgment interest is available only when the

claim is liquidated, that is, when there is no reasonable controversy either as to the plaintiff's right to recover or as to the amount of such recovery. *Blue Tee Corp. v. CDI Contractors, Inc.*, 247 Neb. 397, 529 N.W.2d 16 (1995); § 45-103.02. Although here the amount in dispute is not controverted, a reasonable controversy concerning the right of the Daubmans to recover existed. Thus, the district court erred in awarding prejudgment interest.

### V. JUDGMENT
For the foregoing reasons, we reverse the judgment of the Court of Appeals and remand the cause thereto with the direction that it affirm the judgment of the district court, modified in accordance with this opinion.

REVERSED AND REMANDED WITH DIRECTION.

WRIGHT, J., not participating.