WALKER LAND AND CATTLE CO., A PARTNERSHIP, APPELLEE, V. RUSSELL S. DAUB AND CAROLYN S. DAUB, DEFENDANTS AND COUNTERCLAIMANTS AND THIRD-PARTY PLAINTIFFS, APPELLANTS, AND CHAMBERS STATE BANK OF CHAMBERS, NEBRASKA, APPELLEE, HARRY R. WALKER II, THIRD-PARTY DEFENDANT, APPELLEE.

389 N.W.2d 560

Filed July 3, 1986.    No. 84-955.

Robert E. Wheeler, for appellants.

David A. Domina of Domina & Gerrard, P.C., for appellee Walker Land and Cattle.

KRIVOSHA, C.J., WHITE, and SHANAHAN, JJ., and RIST, D.J., and COLWELL, D.J., Retired.

COLWELL, D.J., Retired.

This case involves two issues: the foreclosure of a farm mortgage brought by plaintiff mortgagee against defendants mortgagors, Russell S. and Carolyn S. Daub, husband and wife

(Daub), and the settlement of accounts between the same parties incurred while plaintiff acted as agent for defendants Daub as manager of the mortgaged farm. From a decree of foreclosure and a judgment on the account in favor of plaintiff for $23,075.78 together with interest and costs entered October 31, 1984, defendants Daub appeal.

The pleadings show that plaintiff, Walker Land and Cattle Co., a partnership (WLC), filed its petition for mortgage foreclosure on March 15, 1982. Defendants Daub answered July 6, 1982, and by cross-claim alleged and prayed for an accounting from WLC for the 1978, 1979, and 1980 crop years. Plaintiff amended its petition March 2, 1983, realleging the mortgage foreclosure cause and stating a second cause of action for judgment on account of services performed and advancements made to Daub.

Where a case has been commenced as an equity matter, the trial court may properly retain jurisdiction with authority to give full relief in all matters presented. *Kuhlman v. Cargile*, 200 Neb. 150, 262 N.W.2d 454 (1978).

As will become apparent from the facts, the issues of this appeal are complicated by plaintiff's dual and conflicting postures: (1) WLC was the owner and holder of the Daub farm mortgage; (2) at the same time, WLC had a fiduciary relationship with Daub as Daub's farm manager with full authority over the mortgaged farm.

> In an action at equity this court must review the record de novo and reach an independent conclusion without being influenced by the findings of the trial court, except, however, that where credible evidence is in conflict, we must give weight to the fact that the trial court saw the witnesses and observed their demeanor while testifying.

(Syllabus of the court.) *Jackson v. Clemens*, 216 Neb. 641, 345 N.W.2d 28 (1984).

"Agency is the fiduciary relation which results from the manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and consent by the other so to act." (Syllabus of the court.) *Reeves v. Associates Financial Services Co., Inc.*, 197 Neb. 107, 247 N.W.2d 434 (1976).

Generally, an agent is required to act solely for the benefit of his principal in all matters connected with the agency and adhere faithfully to the instructions of the principal. *Allied Securities, Inc. v. Clocker*, 185 Neb. 524, 176 N.W.2d 914 (1970).

Unless otherwise agreed, an agent is subject to a duty to keep, and render to his principal, an account of money or other things which he has received or paid out on behalf of the principal.

Comment:

*a*. The agent's duty ordinarily includes not only the duty of stating to his principal the amount that is due, but also a duty of keeping an accurate record of the persons involved, of the dates and amounts of things received, and of payments made. The agent has a duty to take such receipts as are customarily taken in business transactions. His duty in these respects is satisfied if he acts reasonably in view of the business customs of the community and the nature of his employment.

Restatement (Second) of Agency § 382 at 185 (1958).

The contractual relationships of the parties began in March 1977 when Daub (residents of Omaha, Nebraska) rented a farm described as the north half of Section 24, Township 22 North, Range 12 West of the 6th P.M., Wheeler County, Nebraska (farm), from WLC, a California partnership consisting of Harry R. Walker and Harry R. Walker II; the latter, a resident of California, was the active partner (hereafter called Walker). On March 7, 1978, WLC sold and conveyed the farm to Daub; part payment was represented by an $80,000 note secured by a first mortgage on the farm; $22,000 was immediately credited on the note; the $58,000 balance was to be paid in 19 annual installments of $3,052.63 and interest beginning February 1, 1979. About the same time, WLC also sold farmland nearby to a Dr. Sid Garber, an Idaho resident. WLC owned other farmland nearby. The Daub, Garber, and WLC farmlands were custom farmed as one 966-acre unit of corn ground and supervised by Marvin Fritz, a local farmer whose skills, services, and reliability are not questioned. As a California resident, Walker relied upon Fritz for the day-to-day

supervision of the farms and some recordkeeping. It appears generally that Daub had 260 acres under cultivation and Garber had 130 acres. In 1978 Daub paid $25,000 for irrigation wells and equipment installed on their farm.

In March 1977 the parties orally agreed that WLC would act as Daub's agent to supervise the 1977 crop production and harvest, for a 5-percent commission on gross sales. During 1977, Daub paid some of the expenses directly. When Daub bought the farm in March 1978, the oral agency terms were expanded to give WLC full management duties including the payment of all farming expenses either from crop sales or from WLC's $250,000 line of credit at the Production Credit Association of Columbus, Nebraska (PCA), secured by growing crops; of this amount Daub formally guaranteed payment up to $70,000; the PCA funds were obtained by WLC as needed by a sight draft drawn on PCA in favor of either services, suppliers, or deposited in WLC's bank account for its own or agency operations. At a time fixed by PCA following each crop season, WLC was required to pay the PCA account and accrued interest.

The parties generally agreed that WLC would sell harvested crops in the first 90-day period following the harvest year and that WLC would furnish Daub with a report for planning and income tax purposes showing income and expenses; there was no agreement either as to form, detail, or supporting documents. Reports were prepared and accepted by Daub for the 1977, 1978, and 1979 crop years and relied upon by Daub in the preparation of their income tax returns. WLC performed its management duties without serious complaint until April 1981 when Daub discharged WLC upon receiving a demand from PCA to pay Daub's $70,000 loan guarantee for the reason that WLC had sold all 1980 crops and had failed to pay any part of its past due $248,000 loan. Daub also began receiving farm expense statements from WLC creditors, and Walker refused to either cooperate or explain the WLC errors and delay, except to assure Daub that the PCA loan would be paid in full. Ultimately, on September 4, 1981, WLC paid the PCA loan in full from WLC funds derived from the sale of a ranch. Daub's continued demands for an accounting from WLC were finally

met on January 14, 1983, with an accounting report prepared by O'Donnell, Ficenec, Wills & Ferdig, a public accounting firm in Omaha, Nebraska (Ferdig report). It is to be noted that the Ferdig report was actually prepared for use in an unrelated arbitration proceeding conducted in California involving Walker Ranch (a partnership affiliated with WLC), Garber, and William Agee.

Daub's first notice from WLC that the mortgage payments were unpaid was a letter from Walker dated December 30, 1981, demanding the payment due February 1, 1981, to which Daub responded that they were unable to determine the status of the mortgage payments because of the lack of farm records from WLC. Further, Daub claimed that WLC owed them $53,567, which was sufficient to cover any delinquent payments. WLC elected to accelerate the mortgage due date, and the foreclosure suit followed. Later, WLC claimed all mortgage installments on and after February 1, 1980, were due and unpaid, which is supported by the evidence.

Plaintiff had the burden of proof on all issues. In a foreclosure suit the mortgagee must prove the existence of the mortgage lien, the amount and priority thereof, default, and the right to a decree directing sale of the premises in satisfaction thereof. *Wittwer v. Dorland*, 198 Neb. 361, 253 N.W.2d 26 (1977). The accounting issue was properly an equitable remedy, see *Trump, Inc. v. Sapp Bros. Ford Center, Inc.*, 210 Neb. 824, 317 N.W.2d 372 (1982), and the agent had the burden of proof because it managed the business and had control of the accounts, *Anderson v. Clemens Mobile Homes*, 214 Neb. 283, 333 N.W.2d 900 (1983). Plaintiff had the burden to prove its second cause of action on its claimed open account, see *B. C. Christopher & Co. v. Danker*, 196 Neb. 518, 244 N.W.2d 79 (1976), not to a mathematical certainty, but to a reasonable certainty, *Hein v. M & N Feed Yards, Inc.*, 205 Neb. 691, 289 N.W.2d 756 (1980), and that it had satisfied the fiduciary duties owed to Daub.

The related issues presented by plaintiff's second cause of action and defendants' claim for an accounting are first discussed.

A further examination of the 1977, 1978, and 1979 reports

shows that each was handwritten by Walker on one sheet of 9-by 11-inch five-column accounting paper showing side-by-side income and expense items for both the Daub and Garber farms. Although the calculation of farm income was actually by an allotment formula devised by WLC whereby farm productivity, total sales, and production acres (of the Daub, Garber, and WLC farms) were elements, Daub does not seriously contest reported crop sales. The disagreement focuses on the expense items.

The 1977 report shows total income and expenses, including a 5-percent management fee of $3,964.78. At the bottom of the page there is a notation, "Due Daub $11,710.14." This sum was paid to and accepted by Daub. The report was an account stated by WLC fixing and settling the amount due from WLC to Daub. See *Hansen v. Abbott*, 187 Neb. 248, 188 N.W.2d 717 (1971). Therefore, all items of income and expense for the first crop year were settled and paid.

The 1978 and 1979 reports were not final settlements. The items of expense and income are shown together with their totals; expenses exceed income each year. There are no supporting documents, and there is no recapitulation showing either grain on hand or Daub's credit/debit balance. At the bottom of the 1978 report there is a notation, "Loan (Bins) $9805.05." The evidence shows that PCA funds were used to purchase storage bins that were erected on the Daub farm, and there is no record of Daub paying for these bins. Daub claims that the money came out of their PCA funds; however, this is not supported in the evidence. With the exception of fertilizer, mortgage payments, and management fees, most all expense items were reported in rounded dollar amounts, allocated without explanation two-thirds to Daub and one-third to Garber, apparently on the basis of acreage production. The fertilizer supplier kept detailed records for each farm. Daub made no objection to the reports until 1981.

One income item in the 1978 report was unexplained and disregarded in the evidence, the accounting reports, and in the briefs. Under receipts is shown $4,000 received in 1978 for "diverted acres"; however, this sum is not included in the total 1978 income. Whether or not that item was descriptive of a U.S.

Department of Agriculture wheat and grain program where payments were made to farmers for cropland withdrawn, set aside, or diverted from production is not clear. Such a presumption is supported by the expense item of $304 for diverted acres, and the crop production acres for 1978 are shown on the report as 222 acres instead of the usual 260 acres.

Daub claims as error that the trial court adopted the findings and conclusion in the Ferdig report. This is contrary to the record, which shows that the Ferdig report and its credibility were considered by the trial court along with all of the other relevant evidence, as we do in this de novo review.

"A principal whose agent has violated his duties may properly refuse to pay compensation." *Allied Securities, Inc. v. Clocker*, 185 Neb. 524, 527, 176 N.W.2d 914, 917 (1970). " 'A commission cannot be collected by the agent for his services if he has willfully disregarded, in a material respect, an obligation which the law devolves upon him by reason of his agency.' " *Vogt v. Town & Country Realty of Lincoln, Inc.*, 194 Neb. 308, 317, 231 N.W.2d 496, 502 (1975).

Daub claims error that the trial court allowed WLC's claim for a 5-percent commission on all farm income, for the reasons that WLC commingled funds, failed to keep records, fraudulently converted funds, and failed to make an accounting until January 1983.

Daub made no objection to the 1978 and 1979 reports until April 1981, even though it was apparent from an untrained examination that the expenses were rounded and allocated between Daub and Garber. Concerning the commingling of funds, it is generally improper for an agent to place moneys received for the principal in the agent's bank account unless understood by the parties or it is customary. See Restatement (Second) of Agency § 398, comments *b*. and *c*. (1958). Here, the reports show that all Daub-Garber-WLC corn sales were held by WLC for allocation to those parties by a formula, and Daub has never objected; Daub approved WLC's withdrawing PCA funds to pay expenses; further, there is no showing that WLC was either disloyal to Daub or that the commingling of grain and funds during this period was a material fault; rather, WLC violated its duties in failing to keep records and to furnish

accurate reports. Without approving WLC's procedures, we conclude that the trial court properly allowed the management fees for 1978 and 1979. The year 1980 is another matter. Daub was prejudiced in that PCA denied them further credit, and they could neither process their 1980 income taxes nor regularly plan for the 1981 crop year. WLC disregarded its agreement with Daub concerning its management duties and the PCA line of credit; it violated fiduciary duties by failing to apply funds from PCA loans and from the sale of crops to production expenses; it neglected and refused for an unreasonable time to render an accounting, see Restatement, *supra* § 382, comments *a.*, *b.*, and *d.*; and it used and diverted PCA funds, partly guaranteed by Daub, for the unexplained benefit of WLC and Walker. For these willful and material breaches of duty, WLC was not entitled to a management fee for any period subsequent to March 1, 1980.

The settlement and determination of the parties' accounts, as acknowledged by the expert witnesses, is not only difficult but impossible to any degree of certainty, basically caused by lost and incomplete records. The Ferdig report, which used March 1, 1978, as a starting point, mainly concerned the financial transactions of two Walker affiliated partnerships: Walker Ranch and Walker Land & Cattle Co. According to witness Ron Ferdig, the analysis relating to Daub was not done according to generally accepted auditing standards and it did not purport to be a statement of financial position or to reflect the results of operations; it was prepared to assist in evaluating and allocating financial transactions. This report contained numerous explanatory and delimiting footnotes as well as the following caveat at the bottom of each page of the body of the paper: "This analysis was prepared by [the public accounting firm] for use by the principals in negotiating a financial settlement and should not be used for any other purpose. . . ."

The Ferdig report relied primarily on evidence of receipts and disbursements. While a reasonable accounting of income is provided, incomplete records complicate the allocation of expenses. Attempts were made to reconcile disbursements with invoices; however, numerous invoices were missing, and existing invoices did not indicate to which farm the goods and

services were directed. The report states: "Except in rare situations where the quarter number was placed on the invoice by the vendor, or where Marvin Fritz had paid the bill, it could not be reasonably determined, by referring to the invoice, to whom the expenditure should be charged." Consequently, in many instances the expenses were prorated. Many expenses were identified as "unallocated," and no part thereof was charged to Daub.

The question, then, is, Did the Ferdig report together with the other evidence known to Daub fulfill WLC's fiduciary duty to provide Daub with an accounting of the farm transactions to a reasonable certainty? Under the circumstances here, we conclude that it did, even though WLC's performances of its fiduciary duties, including incomplete records, commingling funds, and an unreasonable delay in making an accounting, were less than generally acceptable standards.

The whole evidence shows that WLC sustained its burden of proof on its second cause of action, and the trial court properly entered judgment thereon in its favor; however, the amount of that judgment is modified in accordance with this opinion and the following findings of money due plaintiff from defendants: gross income 1978-80 of $258,488.14; less the net of these expenses: total operating expenses of $257,714.43, less 1980 management fee of $4,494.73, less miscellaneous expenses disallowed by trial court of $4,425.91, plus 1979 and 1980 mortgage payments and interest owed by Daub of $14,281.69, plus advancement for storage bin of $9,805, for total expenses of $272,880.48; leaving money due from Daub to WLC of $14,392.34. Judgment is entered in that amount together with interest as provided by law from the date of the mandate, and also accruing court costs.

Daub assigns as error to the foreclosure decree that a reasonable controversy existed concerning the farm manager accounting issue when WLC declared the default, for which the court should have granted them time to cure the default, and that the court should have denied WLC the right to accelerate the mortgage due date. Daub does not object to that part of the judgment finding that there was due from Daub to WLC $69,704.58 on the note, together with interest accruing at

$10.30 per day from October 25, 1984; that finding gave Daub credit for the payment of the annual principal and interest payments due in 1978 and 1979.

On February 1, 1980, the regular principal and interest installment was due and unpaid. The mortgage note provided that upon default the mortgagee-payee could declare the whole secured debt due, which WLC elected to do. Daub argues that they were entitled to rely on the implied agreement and past performances that WLC would pay these installments out of crop sales, and particularly they could rely on an October 27, 1980, letter from Walker advising that the 1980 harvest should exceed expenses. There might be some merit to that argument up to April 1981; however, such reliance ceased when Daub discovered that WLC had sold all of the grain without paying the PCA loan and WLC refused to account for 1980 funds. That was more than 6 months prior to Daub's receiving the default notice. Whether or not WLC owed money to Daub from the farm operation was properly a subject for determination in the companion causes of action between the parties and the court's power to give full relief to all parties.

Equity courts have power to deny enforcement of mortgage acceleration clauses where such are inequitable, *Occidental Sav. & Loan Assn. v. Venco Partnership*, 206 Neb. 469, 293 N.W.2d 843 (1980), and cause a hardship, *Redding v. Gibbs*, 203 Neb. 727, 280 N.W.2d 53 (1979). Although WLC's dual position as agent and mortgagee increased its burden of proof, we are persuaded that, under the circumstances here, Daub's hardship relates to the companion accounting issue, and the trial court properly entered the foreclosure decree.

AFFIRMED AS MODIFIED.