ALLEN E. DAUBMAN AND RENEE A. DAUBMAN, HUSBAND AND WIFE, APPELLEES, V. CBS REAL ESTATE CO., A NEBRASKA CORPORATION, AND ARLENE ENGELBERT, APPELLANTS.

573 N.W. 2d 802

Filed January 20, 1998. No. A-96-734.

Mark S. Dickhute for appellants.

Richard J. Rensch, of Raynor, Rensch & Pfeiffer, for appellees.

HANNON, IRWIN, and INBODY, Judges.

HANNON, Judge.

Allen E. Daubman and Renee A. Daubman, husband and wife, brought suit against CBS Real Estate Co. (CBS), a Nebraska corporation, and Arlene Engelbert, an agent working for CBS, to recover the real estate commission CBS received for the sale of the Daubmans' home. The Daubmans allege that CBS, through Engelbert's actions, breached the fiduciary duty owed to the Daubmans as their real estate broker. After a bench trial, the court found that CBS and Engelbert had breached the fiduciary duty owed to the Daubmans in several respects and awarded a judgment against both CBS and Engelbert equal to the real estate commission received, plus prejudgment interest and costs. CBS and Engelbert appeal and allege the trial court erred in finding they breached their fiduciary duty to the Daubmans, in not finding the Daubmans had ratified their actions, and in awarding prejudgment interest. We conclude that the evidence does not establish that CBS and Engelbert materially breached any fiduciary duty they owed to the Daubmans. We therefore vacate the judgment and remand the cause with directions to dismiss.

## FACTUAL BACKGROUND

The evidence in this case consists of a stipulation of the parties, oral testimony, and documents. As we are required to do, we review the evidence in the light most favorable to the Daubmans.

CBS is a licensed real estate broker, and Engelbert was the salesperson who primarily handled the sale of the Daubmans' house. Engelbert committed all of the acts which the Daubmans claim to be breaches of CBS' fiduciary duty to them. Her authority to act on behalf of CBS and its liability for her acts is not questioned. Allen Daubman (Daubman), a practicing attorney, actively participated in the transaction, and his authority to act for his wife is not questioned.

The Daubmans desired to sell their home in order to build a new one. On June 2, 1992, they contacted Engelbert to obtain a market analysis of their home. On June 9, Engelbert gave them her analysis, which the parties' stipulation shows a market value of $129,950. When the analysis was delivered, Engelbert

encouraged the Daubmans to list the property for sale with CBS. The Daubmans refused to sign a listing agreement. Engelbert then informed the Daubmans that she was working with a couple, Thomas and Brenda Pedersen, who was looking for a house in the same location and price range as the Daubmans' residence and that the Pedersens had been "pre-approved" to buy a house in that price range. Engelbert offered to show the house to the Pedersens, if the Daubmans signed a listing. The Daubmans told Engelbert they would consider signing a listing. Daubman testified he understood that preapproved buyers had the financial ability to purchase the home and that financing would not be a problem. He testified that Engelbert repeated this assertion later and that these assertions induced the Daubmans to sign the purchase agreement.

On June 10, 1992, the Daubmans signed an authorization to sell, which gave CBS a 3-month exclusive right to sell their house for $139,950, "cash or as terms agreed." The parties added the handwritten sentence, "This is a one party taken for Tom & Brenda Pederson," at the end of the document. The parties stipulated this provision authorized CBS to sell the property only to the Pedersens. The authorization provided for a 7-percent commission for CBS, payable in the event a purchaser who was ready, willing, and able to buy the property at the listed price and terms was found.

After obtaining the listing, Engelbert showed the house to the Pedersens, and they requested that Engelbert prepare an offer to buy the Daubmans' house for $132,000, with a $1,000 earnest money deposit. The offer was to provide that the deposit would be refunded if the Pedersens were unable to obtain financing or the sale was canceled. The Daubmans rejected this offer.

The Daubmans countered with an offer to sell for $139,900, which was accepted by the Pedersens. On June 12, the Daubmans and the Pedersens signed a standard purchase agreement which provided for a sale price of $139,900, with a $2,000 earnest money deposit. The balance was due, in cash, at the closing of the sale. The sale was conditioned upon the Pedersens being able to obtain a conventional or "P.M.I." mortgage loan of $132,900 with initial monthly payments of not more than $1,022 plus taxes and insurance. The agreement pro-

vided that the Pedersens were to apply for the loan within 5 business days and that the agreement was void if the loan was not approved within 30 days. The agreement also provided: "However, if processing of the application for financing has not been completed by the lending agency within the above time, such time limit shall be automatically extended until the lending agency has, in the normal course of its business, advised either approval or rejection." The "[a]pproximate closing date" was July 29, 1992, and the possession date was July 31, subject to the availability of a mover acceptable to the Daubmans.

After signing the agreement, the Daubmans proceeded with their plans and entered into a contract to build their new home. On June 15, the Pedersens applied for financing with Residential Mortgage Services (RMS). Daubman admits to having received periodic reports over the "next several days" from Engelbert regarding the loan application. Engelbert told Daubman there was a problem with the loan application because "there was a history of a prior mortgage foreclosure." On July 9, RMS notified Engelbert that the Pedersens' loan application would probably be rejected. RMS recommended the loan be moved to another lender. Engelbert learned from RMS that the past mortgage foreclosure was against a home owned by Thomas Pedersen and his former wife, who had been awarded the home when they divorced. The former wife had the obligation to pay the mortgage on the home but had defaulted, and that mortgage was foreclosed. The foreclosure showed up in Thomas Pedersen's credit file because he was still on the note. On the day that Engelbert learned RMS would probably not make the loan, she made arrangements for Capital Financial Services (CFS) to consider the loan. The following day, Engelbert learned that CFS could probably make the loan to the Pedersens.

Daubman testified that some time during the week of July 6, Engelbert told him there was a potential problem with the loan application. On July 10, she told him the loan application had been transferred the previous day, and she had assisted the Pedersens in making the new application with CFS. Daubman testified that he objected to the Pedersens' making an application with the second lender and told Engelbert that "we don't

have a purchase agreement anymore." Engelbert disagreed and told Daubman that she moved the application to where there was a good chance the loan would be approved. Daubman asked Engelbert to contact the Pedersens to see if they would agree to make the $2,000 earnest money deposit nonrefundable so the Daubmans could sign a 6-month lease with Washington Heights Apartments (WHA). The Pedersens rejected that request the same day. On the evening of July 16, Daubman and Engelbert met with an official from CFS to discuss the Pedersens' loan prospects, and after that meeting, Daubman informed Engelbert he would prepare a document for the Pedersens to sign and fax it to Engelbert the following day.

On July 17, Daubman faxed a proposed amendment to the purchase agreement to Engelbert. This amendment provided that if the loan application pending with CFS was rejected, the Pedersens would have until August 12 to obtain financing from a new lender. If the Pedersens did not obtain a loan by August 12, the sale would be canceled and the Daubmans would receive the $2,000 earnest money deposit. Daubman testified that if possession of their house was delivered to the Pedersens pursuant to the purchase agreement, the Daubmans would need to rent an apartment while their new home was being built. Obviously, if the sale to the Pedersens did not close, the Daubmans did not need the apartment. The amendment was intended to protect the Daubmans if, while waiting for the Pedersens to obtain financing, they were required to sign an apartment lease.

Engelbert presented the proposed amendment to the Pedersens on July 17. The next day, Brenda Pedersen called Engelbert and rejected the offer. At that time, Engelbert was told by Brenda Pedersen that she had called WHA to check on the availability of apartments. Engelbert then called WHA to learn whether any apartments were available. Engelbert also called Daubman to advise him the Pedersens had rejected the amendment.

Daubman testified that before Engelbert called, the WHA manager was not "pressing on us" to sign the lease; "we were trying to keep the apartment complex at bay." Shortly after Engelbert called WHA, the apartment manager called

Daubman, and as a result of that call, the Daubmans committed to signing the lease. Daubman testified that he learned, and Engelbert confirmed, that she had called the apartment complex to inquire about the lease without his authorization. Engelbert told Daubman she made the inquiry to see whether the apartment would still be available if there was a delay in closing the sale to the Pedersens.

On July 20, after learning Engelbert had contacted WHA, Daubman called Kevin Irish, a CBS general manager, and informed him the Daubmans wanted no further communications with Engelbert. Irish acted as liaison between the Daubmans and Engelbert until the sale of the Daubmans' home was closed.

Engelbert maintained daily contact with CFS and on July 24 learned the Pedersens' loan would be formally approved on July 27. On July 24, she faxed a letter so advising Daubman. The Pedersens received formal approval on July 27; on that date, the Daubmans were so advised and signed a lease with WHA.

Shortly before closing, Daubman informed CBS he did not feel Engelbert was entitled to a commission. Daubman insisted the commission not be paid to CBS upon closing, and CBS refused to waive the commission. The closing agent refused to close the sale without paying CBS the commission unless CBS agreed to waive it. The impasse was resolved when CBS agreed that payment of the commission to CBS would be without prejudice to any claim Daubman might have. Subject to this agreement, Daubman agreed to allow the closing agent to pay CBS a $9,793 commission at the closing.

The Daubmans brought suit in the district court for Douglas County. The court found Engelbert breached the fiduciary duty owed to the Daubmans by subordinating their interests to the interests of the Pedersens. The trial court awarded damages for the commission paid, $9,793, plus prejudgment interest and the Daubmans' costs.

## ASSIGNMENTS OF ERROR

The appellants contend that the district court erred in finding that they breached their fiduciary duty toward the Daubmans, in not finding that the Daubmans ratified the appellants' actions if the fiduciary duty was breached, in finding that the Daubmans

sustained any damage from the appellants' actions, and in awarding prejudgment interest. We conclude the trial court erred in finding that the appellants materially breached any fiduciary duty they owed the Daubmans. This conclusion makes consideration of any but the first assignment unnecessary.

## STANDARD OF REVIEW

Both parties assert this is a case in equity and therefore present the factual issues under that standard. This is a suit for only money, and since no equitable relief is sought, it appears that the case is a case at law. The parties base their positions on *Schepers v. Lautenschlager*, 173 Neb. 107, 112 N.W.2d 767 (1962). In *Schepers*, the Scheperses sued their real estate agent to recover an $8,000 profit the agent and his uncle made upon resale of the listed real estate, as well as to recover the $1,200 commission the Scheperses had paid. The *Schepers* opinion states that the Scheperses sought monetary damages plus equitable relief. We checked the operative petition in the transcript of that case (available in the state archives) and found that in that action, the Scheperses sought to have a constructive trust imposed on the profits made by the agent after reselling the property. This prayer is apparently the reason for the *Schepers* court to find that the Scheperses sought equitable relief. For that reason, *Schepers* is not authority in this case where the only relief that could have been sought is a money judgment.

█ The applicable rule is that "[w]hether the nature of an action is legal or equitable is to be determined from its main object, as disclosed by the averments of the pleadings and relief sought." *White v. Medico Life Ins. Co.*, 212 Neb. 901, 902, 327 N.W.2d 606, 608 (1982). We find no case which was held to be a case in equity where the plaintiff sought only a money judgment. For example, in *Garbark v. Newman*, 155 Neb. 188, 51 N.W.2d 315 (1952), the Nebraska Supreme Court held that an action to recover the purchase price on a contract of sale was an action at law, notwithstanding the fact the action involved recission of the contract. Similarly, in *Barker v. Wardens & Vestrymen of St. Barnabas Church*, 171 Neb. 574, 106 N.W.2d 858 (1961), the court held that a suit to recover money given to a church under a promise to refund was a law action and stated,

"Wherever one person has money to which in equity and good conscience another is entitled, the law creates a promise by the former to pay it to the latter and the obligation may be enforced by assumpsit." *Id.* at 578, 106 N.W.2d at 860. The court also stated that "[a]n action for money had and received is an action at law," and it held the action was one at law. *Id.*

In *Central Sur. & Ins. Corp. v. Atlantic Nat. Ins. Co.*, 178 Neb. 226, 132 N.W.2d 758 (1965), the Nebraska Supreme Court addressed the application of equity standards as opposed to the application of law standards. In *Central Sur. & Ins. Corp.*, two insurance companies disagreed on which was obligated for the defense of a claim against a common insured. They agreed to each pay one-half but reserved the right to litigate the question. The lawsuit brought by one insurance company for the expenses paid was met with a counterclaim by the defendant for the expenses paid. The court observed that the relief sought by both parties was a money judgment and said, "Where none of the extraordinary powers of a court of equity are required in order to give either party the relief he seeks, and a court of law can afford complete relief, the action is one at law." *Id.* at 228, 132 N.W.2d at 760. Based on this reasoning, this action is an action at law.

In *White, supra*, the Supreme Court held that when a case presents an action at law, it will be reviewed as an action at law, notwithstanding the fact that the parties briefed the appeal as one in equity. When reviewing a bench trial in a law action, the trial court's factual findings have the effect of a jury verdict and will not be set aside on appeal unless they are clearly wrong. *Richardson v. Mast*, 252 Neb. 114, 560 N.W.2d 488 (1997); *Bristol v. Rasmussen*, 249 Neb. 854, 547 N.W.2d 120 (1996). In reviewing a judgment awarded in a bench trial, an appellate court does not reweigh the evidence but considers the judgment in a light most favorable to the successful party and resolves evidentiary conflicts in favor of the successful party, who is entitled to every reasonable inference deducible from the evidence. *Sherrod v. State*, 251 Neb. 355, 557 N.W.2d 634 (1997); *Cotton v. Ostroski*, 250 Neb. 911, 554 N.W.2d 130 (1996).

The above standard is more favorable to the appellee than that applicable to the appeal of an equity action, that is, the

appellate court determines factual issues de novo on the record and reaches a conclusion independent of the trial court but gives weight to the trial judge's determination of facts upon which there is a material dispute. See *Schepers v. Lautenschlager*, 173 Neb. 107, 112 N.W.2d 767 (1962). We observe that the standard of review which we apply in this case is more advantageous to the Daubmans than the standard of review used by the parties in their briefs. However, we conclude that notwithstanding that advantage, we must reverse the trial court's decision.

█ The issues presented in this case are questions of law, and when reviewing a question of law, an appellate court reaches conclusions independent of the lower court's ruling. *Baltensperger v. Wellensiek*, 250 Neb. 938, 554 N.W.2d 137 (1996); *Heins v. Webster County*, 250 Neb. 750, 552 N.W.2d 51 (1996).

ANALYSIS

*Judgment Against Engelbert.*

█ The documents in evidence and the stipulation show that the property was listed with CBS under an agreement which provided that CBS, not Engelbert, was entitled to the commission. The commission was in fact paid to CBS. Engelbert was a disclosed agent of her principal, CBS, who was the broker or agent of the Daubmans. The action was clearly based upon the theory that the Daubmans' agent breached the contractual duty owed to its principal. As will be seen later, the agent who materially breaches his or her duty to a principal cannot collect the commission to which the agent is otherwise entitled. The Daubmans proceeded upon this theory and did not rely upon any other theories of liability such as breach of contract, negligence, or fraud. Engelbert's interest in the commission, if any, is dependent upon her agreement with CBS. Engelbert's duty to the Daubmans is that of a disclosed agent of CBS. "As a general rule, where an obligation is that of a principal, a court cannot enforce the obligation against the agent as long as he or she is merely acting as agent." *Mueller v. Union Pacific Railroad*, 220 Neb. 742, 748, 371 N.W.2d 732, 737 (1985). See, also, *Koperski v. Husker Dodge, Inc.*, 208 Neb. 29, 302 N.W.2d 655 (1981); *Stoll v. School Dist. (No. 1) of Lincoln*, 207 Neb. 670, 301 N.W.2d 68 (1981); *Suzuki v. Gateway Realty*, 207 Neb. 562, 299

N.W.2d 762 (1980). This principle was applied in both *Vogt v. Town & Country Realty of Lincoln, Inc.*, 194 Neb. 308, 231 N.W.2d 496 (1975), and *Schepers, supra*, to grant a personal judgment against the defendant real estate brokers and other third persons for the amount of the actual damages the seller suffered. However, in both *Vogt* and *Schepers*, the court awarded judgment against only the listing brokers for the return of the commission, not against others. In the case at hand, the parties stipulated that the Daubmans did not suffer any damage by Engelbert's conduct. Under these circumstances, there is no legal basis for holding Engelbert personally liable for any amount.

 Although an appellate court ordinarily considers only those errors assigned and discussed in the briefs, the appellate court may, at its option, notice plain error. *Miller v. Brunswick*, 253 Neb. 141, 571 N.W.2d 245 (1997); *In re Interest of D.W.*, 249 Neb. 133, 542 N.W.2d 407 (1996); *In re Estate of Morse*, 248 Neb. 896, 540 N.W.2d 131 (1995). Plain error exists where there is an error, plainly evident from the record but not complained of at trial, which prejudicially affects a substantial right of a litigant and is of such a nature that to leave it uncorrected would cause a miscarriage of justice or result in damage to the integrity, reputation, and fairness of the judicial process. *Miller, supra; Law Offices of Ronald J. Palagi v. Dolan*, 251 Neb. 457, 558 N.W.2d 303 (1997). We conclude the trial court committed plain error in finding that Engelbert was personally liable. Any liability for breach of fiduciary duty would be borne by CBS. We therefore conclude that the judgment against Engelbert must be set aside.

CBS is clearly liable for Engelbert's actions. If Engelbert or any other agent or employee of CBS materially breached a fiduciary duty owed to the Daubmans, that breach would justify withholding the commission from CBS, and therefore, a judgment against CBS for the amount of the commission would be proper.

*Duties of Broker to Principal.*

In researching the cases for this opinion, we found that agents were generally accused of breaching their duty by one

act or scheme. For example, in *Pearlman v. Snitzer*, 112 Neb. 135, 198 N.W. 879 (1924), the agent located a buyer who was willing to pay $9,000 for certain property. The agent then went to the owner of the property and, without telling the owner about the prospective buyer, obtained a listing to sell the property for $8,500. Part of the agreement provided that the agent could keep anything over $8,500 as commission.

Similarly, in *Schepers v. Lautenschlager*, 173 Neb. 107, 112 N.W.2d 767 (1962), the agent knew of a buyer willing to pay more than the listing price. The agent did not disclose this information to his principal but, surreptitiously, purchased the property with the help of his uncle. The agent realized a profit when the land was resold.

In *Lee v. Brodbeck*, 196 Neb. 393, 243 N.W.2d 331 (1976), the agent assured the buyers she could easily sell certain real estate when she had no knowledge she could do so. The agent was then unable to sell the buyers' property after it was listed.

In *Firmature v. Brannon*, 223 Neb. 123, 388 N.W.2d 119 (1986), the broker attempted to convince his principal to sell a business for the price offered by a prospective buyer, rather than attempting to convince the buyer to pay the principal's asking price.

In *Allied Securities, Inc. v. Clocker*, 185 Neb. 524, 176 N.W.2d 914 (1970), the purchaser of certain property was also the president of the corporation which was the listing broker.

In *Vogt v. Town & Country Realty of Lincoln, Inc.*, 194 Neb. 308, 231 N.W.2d 496 (1975), the listing agent arranged a sale to a fellow broker, unknown to the principal, and the fellow broker later sold the house for a profit.

In this case, Engelbert is accused of breaching CBS' fiduciary duty to the Daubmans in several different ways. In deciding the above-cited cases, the Supreme Court enunciated several general principles applying to this area of law. For example:

> A real estate broker is an agent owing a fiduciary duty (1) to use reasonable care, skill, and diligence in procuring the greatest advantage for his client, and (2) to act honestly and in good faith, making full disclosures to his client of all material facts affecting his interests.

*Firmature*, 223 Neb. at 127, 388 N.W.2d at 121.

"A broker owes to his employer the duty of good faith and loyalty, and is required to use such skill as is necessary to accomplish the object of his employment. . . . It is also his duty to give his client the fullest information concerning his transactions and dealings in relation to the property with reference to which he is employed . . . ." [Citation omitted.]

". . . This requirement not only forbids conduct on the part of the broker which is fraudulent or adverse to his client's interests, but also imposes upon him the positive duty of communicating all information he may possess or acquire which is, or may be, material to his employer's advantage."

*Schepers*, 173 Neb. at 117-18, 112 N.W.2d at 773.

An agent is entitled to no compensation for a service which constitutes a violation of his duties of obedience. . . . This is true even though the disobedience results in no substantial harm to the principal's interests and even though the agent believes that he is justified in so acting.

Restatement (Second) of Agency § 469, comment *a*. at 400 (1958).

■ In summary, the above cases state that a broker or agent owes his or her principal the following duties: (1) to utilize the skill necessary to accomplish the task undertaken, (2) to be honest and act in good faith, (3) to be loyal, (4) to disclose all material facts, (5) to possess no undisclosed adverse interests, and (6) to be obedient to the principal. Our research of several authorities revealed that the above-listed duties include all of the fiduciary duties a real estate broker owes to his or her principal. See, also, *Jansen v. Williams*, 36 Neb. 869, 55 N.W. 279 (1893); *Wisnieski v. Harms*, 188 Neb. 721, 199 N.W.2d 405 (1972); the Restatement, *supra*, §§ 385 and 376; 12 Am. Jur. 2d *Brokers* § 203 (1997).

In this case, there is no claim that Engelbert did not utilize the skill necessary to sell the property, so we need not discuss that point. The requirement of full disclosure, the obligation to not possess an adverse interest, and the duty to obey are merely aspects of loyalty. However, the division of the duty of loyalty facilitates the analysis of the case.

■ A broker's conduct must also be measured in the light of the following rules: "The existence and extent of the duties of the agent to the principal are determined by the terms of the agreement between the parties, interpreted in light of the circumstances under which it is made . . . ." The Restatement, *supra*, § 376 at 173. The Restatement, *supra*, § 385, comment *a*. at 193, states that notwithstanding the agent's duty to obey reasonable instructions, "A real estate broker selling on commission has a right to use customary business methods without interference by the principal."

In analyzing Engelbert's conduct, we must recognize that the listing authorized her to sell the house only to the Pedersens. Therefore, the trial court's finding that she made "every effort . . . to consummate [a] sale of the premises with the Pedersens only" was merely a finding that she was doing what she contracted to do. Furthermore, after the purchase agreement was signed, the Daubmans were obligated to sell the home to the Pedersens unless the Pedersens breached the agreement. This is not to say that Engelbert could not still breach her fiduciary duty by putting her interests or the Pedersens' interests ahead of her principal's. However, Engelbert's efforts to sell the property only to the person with whom the sale is authorized does not tend to prove disloyalty on her part.

### Breaches Alleged by Daubmans or Found by Court.

In their brief, the Daubmans argue that Engelbert breached the fiduciary duty owed to them in four ways: (1) by misrepresenting the Pedersens' financial condition, (2) by moving the Pedersens' loan application to a second lender, (3) by contacting WHA, and (4) by insisting the commission be paid at closing. We shall consider each of these points separately.

In its order of judgment, the trial court found that Engelbert made every effort to consummate a sale with only the Pedersens; that "[w]hen the Pedersens' financial condition was shown to be precarious, the defendant Engelbert took several steps to keep the transaction alive for the Pedersens"; that she put her interests and the interests of the Pedersens ahead of the Daubmans' interests; that the most "glaring example of [which was contacting WHA and the] [m]ore damaging was the fact

that closing of the sale of the Daubman home was [made] contingent upon payment of [the] commission." It appears the trial court treated the various acts relied upon by the Daubmans as breaches of fiduciary duty to support a more general breach of loyalty by finding that Engelbert put the Pedersens' interests and her interests ahead of the Daubmans' interests. To analyze all issues, we shall consider whether the evidence supports a finding that Engelbert put her interests and the interests of the Pedersens ahead of the Daubmans' as a separate, fifth issue.

### Representations of Pedersens' Financial Condition.

The trial court made no specific findings in connection with this claim. However, the evidence establishes that Engelbert represented to the Daubmans that the Pedersens had been preapproved for credit in an amount greater than would be required to purchase the property. Daubman testified that Engelbert told the Daubmans the Pedersens had been preapproved and that he understood this to mean that the buyers had the financial ability to purchase the home and that financing would not be a problem. The evidence establishes the Daubmans relied upon this representation, both in listing the property and in signing the purchase agreement. This alleged breach of fiduciary duty is difficult to compare to any of the brokers' duties listed above. There is no evidence that Engelbert made the statement dishonestly or in bad faith. It is self-evident that Engelbert was wasting her time and talent if the Pedersens were not financially qualified to buy the home that Engelbert wanted a listing to sell. The evidence does not support an inference that Engelbert was disloyal in making the representation.

Engelbert's representation was vague in that it does not say or purport to say who preapproved the Pedersens' credit. Daubman testified he understood Engelbert to mean the buyers had the financial ability to purchase the home and financing would not be a problem. However, there is no proof the Pedersens did not have the financial ability to purchase the home, and in fact, they did obtain the required financing within the time allowed by the purchase agreement.

Even if the evidence were interpreted as proof that the Pedersens were not preapproved, the evidence does not support

a finding that the representation was a material breach of CBS' fiduciary duty to the Daubmans. The rule is that a " 'commission cannot be collected by the agent for his services if he has willfully disregarded, in a material respect, an obligation which the law devolves upon him by reason of his agency.' " *Vogt v. Town & Country Realty of Lincoln, Inc.*, 194 Neb. 308, 317, 231 N.W.2d 496, 502 (1975). In *Walker Land & Cattle Co. v. Daub*, 223 Neb. 343, 389 N.W.2d 560 (1986), this rule was quoted. The court held that the breach of some duties by the agent in 1 year was willful and material, and the Daubs were prejudiced. The court disallowed Walker Land and Cattle Co.'s commission for the year in which that breach occurred, but with respect to other similar breaches in other years, the court noted: "[T]here is no showing that WLC [Walker Land and Cattle Co.] was either disloyal to Daub or that the commingling of grain and funds during this period was a material fault . . . ." *Id.* at 350, 389 N.W.2d at 565. The court held that the allowance of the commissions for prior years was proper. On this issue, the evidence does not establish that Engelbert deliberately misled the Daubmans on the Pedersens' financial ability, and the Pedersens proved to have the financial ability to close the sale according to the terms of contract. Engelbert's breach was therefore not willful, and the Daubmans were not prejudiced by her assurances, even if she did not have a sound basis for making them. This breach, if it is a breach, was not willful and material and therefore could not justify denying CBS its commission.

*Moving Pedersens' Loan Application to CFS.*

The trial court made no specific findings with regard to this claim by the Daubmans. This claim might be included within the finding of the trial court that

> every effort was made by defendant Engelbert to consummate sale of the premises with the Pedersens only. When the Pedersens' financial condition was shown to be precarious, the defendant Engelbert took several steps to keep the transaction alive for the Pedersens, and, more to the point, even when events became detrimental to the plaintiffs.

Engelbert's actions must be judged in the light of the circumstances that existed at the time Engelbert arranged for an

application to be filed with CFS. At that time, the Daubmans had signed a purchase agreement with the purchaser that Engelbert had produced, and that purchaser was ready and willing to buy the real estate upon the terms prescribed in the purchase agreement. The Daubmans had not indicated to Engelbert they did not want to close the sale to the Pedersens. CBS was contractually bound to sell the home to the Pedersens for the Daubmans. Engelbert's "every effort" to consummate the sale with the Pedersens was exactly what Engelbert was obligated to do. The evidence does not show that when Engelbert made the arrangements, she was aware of any desire of the Daubmans not to complete the sale within the time limits prescribed by the purchase agreement. Undoubtedly, Engelbert had a considerable interest in obtaining her commission. We find no cases suggesting that an agent's desire to obtain an agreed upon commission is a breach of his or her fiduciary duty.

Daubman told Engelbert after learning of the application to CFS that "we don't have a purchase agreement anymore." Assuming, but not deciding, that the purchase agreement would have allowed the Daubmans to treat the Pedersens' application to CFS as a breach or an anticipatory breach of the purchase agreement, the Daubmans did not choose to terminate the contract. At most, the Daubmans had the right to cancel the contract. Apparently, they sought to utilize the claimed breach to negotiate concessions from the Pedersens. There is no evidence that Engelbert impaired this attempt. The only evidence on the subject is to the effect that Engelbert carried the proposed amendment to the Pedersens as requested. Any thought that she violated a duty of loyalty in this process is strictly speculation. The evidence does not show that Engelbert was dishonest or acted in bad faith.

Engelbert did help to change the loan without telling the Daubmans that RMS had stated the Pedersens' loan application would probably not be approved. Assuming that the Daubmans desired to complete their contract by its terms, the act of moving the loan application could not be a material breach. There is no evidence that Engelbert had any interest or motive in doing this other than to close the sale that she had contracted to bring about.

*Engelbert's Contact with WHA.*

According to the stipulation, Engelbert called WHA to find out if any apartments were available for lease. When asked the purpose of this call, Engelbert testified that "[b]ecause time is of the essence . . . I needed to get this closed so they wouldn't have to — they wouldn't miss out on their lease, and all of the things that were pertinent to that." The amendment to the purchase agreement, prepared by Daubman, stated: "Sellers must sign a six-month apartment lease prior to the date by which Capital Financial Services will make a decision on whether to approve . . . ." There is no evidence that Daubman told Engelbert that he was stalling WHA or that she was not supposed to disclose the name or the identity of the apartment complex. Since Engelbert knew the name of the complex, it is not surprising that she would disclose it to the Pedersens.

The Restatement (Second) of Agency § 383 at 187 (1958) provides: "Except when he is privileged to protect his own or another's interests, an agent is subject to a duty to the principal not to act in the principal's affairs except in accordance with the principal's manifestation of consent." The comment following the rule states that unless otherwise expressly provided or circumstances indicate otherwise, the agent is to act in accordance with custom and to use good faith and discretion.

The fact the agent does something the principal does not desire does not necessarily mean the act is disloyal, particularly when there is no evidence showing that Engelbert should have known that Daubman did not want Engelbert to call WHA or that Brenda Pedersen had already called the complex. "If a broker performs unauthorized acts . . . he is liable to his principal for the loss or damage which results therefrom." 12 C.J.S. *Brokers* § 55 at 166 (1980). Even if Engelbert's action in calling WHA was unauthorized, it was not in violation of the fiduciary duties recognized by the above authorities. Therefore, at most, CBS would be liable only for damages, and the evidence established there were no damages.

The parties have stipulated that Engelbert was not told she could not contact WHA. She was not required to suspect that the Daubmans were not being forthright with WHA. The record contains no evidence that would support a finding that

Engelbert's call to WHA would have adversely affected the Daubmans' interests except for the fact that the Daubmans were stalling WHA. Engelbert had no knowledge of this fact. The evidence would not support a finding that Engelbert breached her fiduciary duty by calling WHA.

*CBS' Refusal to Waive Commission.*

The Daubmans argue that CBS violated its duty of loyalty by refusing to waive payment of the commission. The trial court found that the more damaging example of how Engelbert put her and the Pedersens' interests ahead of the Daubmans' "was the fact that closing of the sale of the Daubman home was contingent upon payment of Engelbert's and CBS' commission." At the time CBS refused to waive payment, it was contractually entitled to the commission unless it had breached its fiduciary duty before that time. As such, the question is whether an agent commits a breach of its fiduciary duty by refusing to waive payment of an earned commission realized by the efforts of the agent.

"When the broker secures a prospective buyer who is ready, willing, and able to purchase the subject property, the person who hired the broker has received the service for which he or she has contracted . . . ." *Marathon Realty Corp. v. Gavin,* 224 Neb. 458, 462, 398 N.W.2d 689, 693 (1987). The case goes on to hold that an agent who has rendered the agreed upon service is entitled to be paid, absent a breach of trust.

In their brief, the Daubmans do not relate the "insisting that the commission be paid from the sale proceeds," brief for appellees at 26, to any specific breach of fiduciary duty, but, rather, base their position on the dilemma in which CBS' position placed them, that is, the Daubmans had to either allow the commission to be paid or lose the sale and subject themselves to a possible specific performance action by the Pedersens. We find no case which considers this question, but we cannot believe an agent is disloyal by insisting the principal pay a commission that has been earned. The authority we find on the agent's ability to insist upon being paid leads us to believe CBS did not have a duty to waive the commission or be adjudged disloyal.

The Restatement throws some light on the matter. Section 463 at 383 states: "An agent whose principal violates or threatens to violate a contractual or restitutional duty to him has an appropriate remedy. He can, in a proper case: (a) maintain an action at law . . . (d) refuse to render further services; (e) exercise the rights of a lien holder." Section 464 at 384 states:

Unless he undertakes duties inconsistent with such a right or otherwise agrees that it is not to exist:

(a) an agent has a right to retain possession of money, goods, or documents of the principal, of which he has gained possession in the proper execution of his agency, until he is paid the amount due him from the principal as compensation for services performed . . . .

"An agent who is entitled to . . . compensation for his services, has a lien upon the principal's goods or property which comes lawfully in his possession . . . ." 3 C.J.S. *Agency* § 357 at 171 (1973). "An agent may retain his compensation out of funds of the principal in his hands." *Id.*, § 359 at 173. We find no law in Nebraska holding that a real estate agent does or does not have a lien on the property of the principal in the agent's possession, and in this case, CBS did not claim a lien. We cite the general authority on the agent's right to a lien to demonstrate that an agent who has earned a commission has a clear right to insist on being paid and that refusal to waive such right cannot be held to be a violation of the agent's duties. CBS had no obligation to waive its right to a commission.

*Placing Pedersens' and Engelbert's Interests First.*

The trial court made a specific finding that Engelbert put her interests and the interests of the Pedersens before the Daubmans' interests. As we have indicated, this finding is based upon a misunderstanding of the duties Engelbert and CBS had toward the Daubmans. When an agent is hired to sell a certain piece of property to a certain person, the attempt to get the designated buyer to purchase the property cannot be interpreted as an act in the interests of the prospective buyer, and attempts by the agent to close the sale within the terms of the listing agreement cannot be interpreted as an act in the interests of the agent simply because the agent will receive a commission upon clos-

ing. The evidence would not support the finding that Engelbert placed her interests and the Pedersens' interests above those of the Daubmans' interests.

## CONCLUSION

There is no evidence to support a finding that CBS, through Engelbert, breached its fiduciary duty to the Daubmans. Therefore, the judgment of the trial court against CBS and Engelbert cannot stand. The judgment of the trial court is vacated, and the cause is remanded with directions to dismiss.

JUDGMENT VACATED, AND CAUSE REMANDED
WITH DIRECTIONS TO DISMISS.